# In the
# United States Court of Appeals
## For the Seventh Circuit

Nos. 05-1463 & 05-1464

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

LAURA WASZ and BRUCE WASZ,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 CR 1103—**Elaine E. Bucklo**, *Judge.*

ARGUED FEBRUARY 6, 2006—DECIDED JUNE 14, 2006

Before FLAUM, *Chief Judge*, and ROVNER and SYKES, *Circuit Judges.*

ROVNER, *Circuit Judge.* After selling millions of dollars' worth of stolen goods on eBay, Laura and Bruce Wasz pleaded guilty to committing wire fraud in violation of 18 U.S.C. § 1343. The district court ordered them to serve prison terms of 70 and 83 months, respectively. Both defendants appeal their sentences, jointly contending that the district court overestimated the loss resulting from their criminal conduct and improperly characterized them as organizers or leaders of the offense. Finding no clear error in either sentencing determination, we affirm the sentences.

**I.**

Laura Wasz and her son Bruce Wasz owned three pawn shops in the Chicago area. Beginning in September 2001 and continuing until June 2003, the Waszes used those shops as a front for selling stolen goods on eBay, the popular Internet auction site. The Waszes obtained the stolen merchandise from co-defendants Peter Giannopoulos, Daniel Bonaguidi, Robert Savino, Spyros Arvanitakis, Jason Wolber, George Lukaszewski, and Kim Marx—whom the parties aptly label the "thieving co-defendants." Before they hooked up with the Waszes, the thieving co-defendants were stealing merchandise from Home Depot and similar retailers and then returning the items to the stores for cash refunds, as if they had been legitimately purchased. Over time, changes in store policies made it increasingly difficult for the thieves to return the stolen goods in exchange for cash. A timely introduction to the Waszes by a mutual acquaintance, however, provided the thieves with another outlet for the merchandise they were stealing.

The Waszes and their thieving co-defendants struck up a mutually profitable arrangement: the thieves would obtain the merchandise, and the Waszes would fence it. The thieves would steal items from home improvement and building supply stores including Home Depot, The Great Indoors, and Expo Design Center, at locations not just in the Chicago metropolitan area but also in Colorado, Kansas, Maryland, Michigan, Minnesota, Missouri, New Jersey, Ohio, Tennessee, Virginia, and Wisconsin. The Waszes often identified specific items that they wanted the thieves to steal, including kitchen appliances, garage door openers, tankless water heaters, sump pumps, snow blowers, chainsaws, pressure washers, mosquito extermina-tors, faucets, and household tools. On occasion, when the thieves embarked on road trips to victimize out-of-state retailers, the Waszes would advance them funds to cover

their expenses. The thieves, in turn, would report by telephone on the progress of their trips. At the Waszes' instruction, the thieves would remove price tags and other identifying marks from the stolen merchandise so that the provenance of the goods would appear legitimate to buyers. The Waszes also maintained a trail of falsified paperwork on the merchandise to make it appear as though they had obtained it legitimately, and in furtherance of that effort, they had the thieves complete fictitious invoices on the goods they stole. By standing agreement, the Waszes paid the thieves cash for the stolen goods in amounts between 33 and 40 percent of their retail value.

On receipt of the contraband, Laura and Bruce Wasz divided the items between themselves, stored the merchandise at their pawn shops and other locations, and then sold the items over the Internet. Under a number of different user names, the Waszes offered the stolen goods for sale on eBay. Both described themselves as "honest" sellers and concealed from prospective buyers the fact that the merchandise was stolen. Goods were frequently described as "new," "brand new," and "new in box". The items typically were offered for sale at prices substantially below their usual retail value: the Federal Bureau of Investigation ("FBI") would later prepare an analysis indicating that the Waszes sold their most popular lines of stolen goods at prices averaging 62 percent of the goods' retail value. Needless to say, buyers snapped up the goods, unaware that they were purchasing stolen items. Over the time span of this scheme, the Waszes completed auctions of more than 13,000 items at sale prices totaling more than $2.3 million.

The government was tipped off to the scheme when a manufacturer of sump pumps complained to the FBI that its products were being offered for sale on eBay in "new in box" condition at less than their wholesale value and without the manufacturer's permission. Investigation led the government to some of the thieving co-defendants, who

agreed to cooperate and in some cases engaged in electronically monitored conversations with the Waszes.

The Waszes ultimately were charged in a multi-count indictment with engaging in both mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, conspiring with their nine co-defendants to transport stolen goods in and receive stolen goods from interstate commerce in violation of 18 U.S.C. §§ 371 and 2315, and possessing stolen goods that had moved in interstate commerce in violation of 18 U.S.C. § 659. Both defendants pleaded guilty to Count One, which charged them with wire fraud. The thrust of that count and the companion charges of mail and wire fraud was that the Waszes had defrauded the eBay customers who had purchased stolen merchandise from them by misrepresenting themselves as honest sellers, affirmatively concealing the stolen nature of the goods they were offering for sale, and falsely representing and creating the false impression that they had legitimate possession of such merchandise and could lawfully transfer ownership of the goods to the buyers. (Like all eBay buyers and sellers, the Waszes had accepted the terms of eBay's User Agreement, which in relevant part prohibits the sale of stolen merchandise.[1]) The indictment identified various mail and wire communications executed in furtherance of this fraudulent scheme. The wire communication underlying Count One was an e-mail sent from the Chicago area to San Jose, California (where eBay has its headquarters) establishing one of the Waszes' eBay accounts. R.1 at 8.

Pursuant to the United States Sentencing Guidelines, the advisory sentencing ranges for both Bruce and Laura Wasz

---

[1] Concretely, individuals who bought stolen items from the Waszes were at a disadvantage in the sense that warranties and other consumer protections on the items were in some cases unavailable because the items had been stolen.

turned in large measure on the loss attributable to their crime. Section 2B1.1 of the Guidelines, which applies to offenses involving stolen property, specifies a base offense level of 6 for the Waszes' offense, but it also mandates an increase to that offense level commensurate with the extent of the loss. *See* U.S.S.G. § 2B1.1(b)(1) (Nov. 2001).[2] In her pre-sentence report ("PSRs") for each of the Waszes, the probation officer estimated that the loss in this case was between $1 million and $2.5 million dollars, an amount that called for a 16-level increase in the base offense level. *See* § 2B1.1(b)(1)(I). The probation officer's estimate of the loss tracked the estimate that the government had set forth in its version of the offense. Although the proceeds of the Waszes' eBay sales exceeded $2 million, the government conceded that not all of the goods sold by the Waszes were stolen. However, the Waszes had sold certain product lines on a frequent basis, and these corresponded with the types of items their thieving co-defendants had regularly stolen from retailers. A preliminary government analysis had identified ten such product lines. The Waszes had sold over 2,000 items from these lines, and sales of products in these lines had yielded $641,782.62 in gross proceeds to the Waszes. The retail value of these items totaled an estimated $1,029,907.06. R. 232, Government's Official Version of the Offense at 15 & Ex. 2.[3] The probation officer agreed

---

[2] The 2001 version of the Guidelines was used in this case pursuant to the Probation Officer's determination that the earlier version was more beneficial to the defendants than the version in effect at the time of their sentencing. R. 230 at 10, R. 232 at 10; *see* U.S.S.G. § 1B1.11(b)(1). Therefore, all references to the Guidelines in this opinion are to the 2001 version of the Guidelines.

[3] Prior to sentencing, the government updated that analysis to include the fourteen most popular stolen product lines that
(continued...)

with the government that this analysis was adequate to establish that the loss exceeded $1 million. R. 230 at 11-12; R. 232 at 11-12.

The defendants contended that the probation officer's loss calculation was too high. With the support of a loss analysis prepared by a forensic accounting firm that they had engaged, the Waszes argued that the actual loss fell between $400,000 and $1 million, an amount that would have called for a more modest increase of 14 levels to the base offense level. *See* § 2B1.1(b)(1)(H). The defendants suggested that the loss could be calculated from two different perspectives: the gain realized by the Waszes on the sale of the stolen goods or the actual loss suffered by the retailers from the theft of their merchandise.

Looking at the loss in terms of what the Waszes gained from their criminal conduct, the defendants proposed that the loss was equal to the net revenue that the Waszes realized on the sales of the stolen merchandise. The Waszes' calculation of this amount began with an effort to cull from the their total eBay sales during the relevant time period the revenue realized on items that were not available for sale at the stores targeted by the Waszes' thieving co-defendants and thus (presumably) had not been stolen. These include items such as cars, used goods, jewelry, clothing, computers, office supplies, health and beauty items, and eyeglasses. Removing those items yielded corrected sales figures of $1,273,237 for Laura Wasz and $991,067 for Bruce Wasz. R. 205, Hopewell Report at 5-6. In the view of the defendants' consultants, those figures then

---

[3]  (...continued)
the Waszes offered for sale via eBay. That analysis indicated that the Waszes sold more than 6,500 items from these lines for amounts totaling over $1.4 million. The retail value of these items totaled in excess of $2.2 million. R. 203 Gov. Ex. 5.

had to be reduced further to reflect the cost of generating that revenue:

> [T]otal transactions—or using the accounting term—gross revenue, is not "gain", as the concept of gain includes not only revenue but the offset of revenue by expenses. The Wasz's are actually business owners. They operate legitimate pawn and second hand dealer businesses. As such, in determination of gain one must subtract from gross revenue the cost of generating that revenue. From the business records of the Wasz's, the consultants have determined that the cost for Laura to generate the $1,351,893 in total [eBay] transactions was $894,676 or 66%. The cost for Bruce to generate the $1,307,987 i[n] total transactions was $892,724 or 68%. Applying those percentages to the $1,273,237 and $991,067 in [corrected] sales subject to the indictment, the cost of generating those sales was $842,622 for Laura and $676,420 for Bruce.

R. 205, Hopewell Report at 7. Subtracting those costs from the corrected sales figures for each defendant yielded net revenue figures of $430,615 for Laura Wasz and $314,647 for Bruce Wasz. *Id.* Combining the two produced a collective net gain of $745,262 for both defendants. *Id.*

Looking at the loss from the perspective of the retailer victims, the defendants proposed that the loss should be measured not by the total retail value of the items stolen, but rather the profit the retailers lost as a result of their inability to sell the stolen items. That would be the gross profit the retailers would have realized on the sale of the goods, an amount equal to the retail price of the items less the retailers' cost of acquiring the goods for sale. (Overhead and other fixed administrative costs would not be deducted, as the retailers would have incurred these costs regardless of the lost sales.) *Id.* at 6. Looking to data on the gross profits of home improvement and building supply retailers,

the Waszes' consultants had identified 31 percent as a reasonable estimate of the percentage of gross profit that such retailers derive from the sale of their goods. Using that percentage as the measure of the retailers' loss, the defendants contended that the retailers had lost a total of $701,934.17. *Id.* at 7.[4]

---

[4] There is an apparent error in the consultants' calculation of the retailers' lost profit. Rather than applying the 31-percent figure to the gross revenue that the retailers would have realized on the sale of the stolen goods by selling them at typical retail prices, the consultants instead applied that percentage to the revenue that Bruce and Laura Wasz had realized from the sale of the stolen merchandise. *See* Hopewell Report at 7 (applying the 31-percent figure to defendants' corrected total eBay sales). Yet, the Waszes were not selling the stolen items on eBay at their usual retail prices but rather at substantial discounts: as we noted above, an FBI analysis indicated the Waszes sold items from the most popular lines of goods at prices averaging of 62% of their retail prices. Moreover, there is no reason to believe that a fence realizes the same percentage of gross profit on the sale of stolen merchandise as a retailer does in making a legitimate sale. The 31-percent figure should have been applied to the sum total of the retail prices of the stolen goods.

As it turns out, the error does not make a dramatic difference in the relevant loss figure in this case. As we have mentioned, the government in an effort to quantify the loss prepared a summary identifying certain product lines that the Waszes sold on eBay with some regularity and that their thieving co-defendants admitted having stolen. According to an updated summary submitted at sentencing, the retail value of these items alone totaled just over $2.2 million. *See* R. 203, Gov. Ex. 5; *see* n.3, *supra*. The government cited that total as a reasonable albeit conservative estimate of the loss. Applying the 31-percent figure to that amount, rather than to the Waszes' corrected total eBay sales would yield a total of over $682,000. That amount still falls within the loss range of $400,000 to $1 million that the Waszes

(continued...)

At sentencing, the district court found that the loss was more than $1 million but no greater than $2.5 million. The court agreed with the government that the loss should be measured using the typical retail value of the stolen merchandise sold by the Waszes. R. 251-2 at 19-20. The court expressly rejected the defendants' contention that the loss ought to be limited instead to the gross profit that the retailers would have realized on the stolen goods. "[A]s I understand it, the store lost an item . . ., so the store got nothing, so it's a total loss to [the store], both its profit and its cost. So . . . it is whatever the retail value would be, I think." *Id.* at 4; *see also id.* at 21. The court added that the thefts likely imposed additional costs on the retailers that they would not have incurred otherwise. *Id.* at 8. The court likewise rejected the Waszes' alternative contention that the loss should be measured using the proceeds realized on the defendants' sales of the stolen items and then deducting from those proceeds the costs the Waszes had incurred to generate the sales. The court noted that the Waszes were selling the goods at prices well below their typical retail value. For that reason, an approach based on the proceeds of those illegitimate sales was not an appropriate way to calculate the retailers' loss. *Id.* at 18-19, 21. Ultimately, the court formally adopted the probation officer's calculation of the loss. *Id.* at 21.

The court also found that Bruce and Laura Wasz both qualified as organizers or leaders of the offense and increased their offense levels by four levels based on their aggravating role. U.S.S.G. § 3B1.1(a). Here, too, the court adopted the probation officer's analysis. R. 251-2 at 33. The probation officer reasoned that the Waszes had played a leading role in that they owned the pawn shops used as

---

[4] (...continued)
contended was appropriate.

fronts for the fencing operation, identified products they wished their co-defendants to steal, advanced funds to their co-defendants to cover the costs of their road trips, directed their co-defendants to complete false invoices in order to hide the stolen nature of the merchandise, and benefitted financially from the scheme. R. 230 at 13-14; R. 232 at 13-14.

These and other adjustments resulted in total adjusted offense levels of 27 for each defendant. Coupled with a criminal history category of I, that offense level produced an advisory sentencing range of 70 to 87 months for Laura Wasz. Bruce Wasz's more extensive record of prior offenses placed him in a criminal history category of IV, which yielded a sentencing range of 100 to 125 months. The district court ordered Laura Wasz imprisoned for 70 months—a term at the bottom of the advisory range. The court ordered Bruce Wasz to serve 83 months in prison—a term that was below the advisory range but, in the court's view, more in line with the term it had imposed on his mother. R. 251-2 at 66.

## II.

Pursuant to the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738 (2005), the district court was not obligated to impose a sentence within the range called for by the Sentencing Guidelines and, indeed, did not do so in Bruce Wasz's case. Nonetheless, the court was required to and did consult the advisory Guidelines range in selecting an appropriate sentence. *E.g.*, *United States v. Laufle*, 433 F.3d 981, 984-85 (7th Cir. 2006). For that purpose it was of course necessary for the court to accurately calculate the sentencing range called for by the Guidelines, "so that that calculation c[ould] serve as a meaningful guide in the district court's imposition of a

final sentence." *United States v. Baretz*, 411 F.3d 867, 877 (7th Cir. 2005). Our task on appeal is to determine whether the district court's calculations were correct. *E.g.*, *Laufle*, 433 F.3d at 984-85. The Waszes contend that the district court erred in holding them to account for a loss amount between $1 million and $2.5 million and in characterizing them as organizers or leaders in the scheme to steal goods from retailers and fence those goods on the Internet.

**A.**

We begin our review with the loss calculation, which had the most pronounced impact on the defendants's sentencing level. To the extent that calculation turns on factual determinations, we review it for clear error. *E.g.*, *United States v. Schaefer*, 384 F.3d 326, 331 (7th Cir. 2004). However, threshold questions concerning the meaning of "loss" and the methodology to be used in measuring that loss present questions of law that call for *de novo* review. *United States v. Sensmeier*, 361 F.3d 982, 986 (7th Cir. 2004); *United States v. Walker*, 234 F.3d 780, 783 (1st Cir. 2000).

We should make one point clear at the outset: the Waszes each may be held to account for the total value of the merchandise stolen by their thieving co-defendants and sold by either Bruce or Laura Wasz on eBay. There is no dispute that the steal-to-sell venture among the Waszes and their thieving co-defendants qualifies as a jointly undertaken criminal activity for purposes of the loss calculation. *See* U.S.S.G. § 1B1.3(a)(1)(B). The thieves were stealing on the Waszes' behalf, customizing their thefts to the Waszes' preference for particular types of goods and receiving by standing arrangement agreed-upon percentages of the retail value of those goods. And although the Waszes themselves maintained separate eBay accounts and to some degree auctioned off the merchandise independently of one another, there is no doubt that each was aware of the other's

sales activity. The record indicates that the Waszes divided the stolen merchandise between themselves; they sometimes instructed the thieves to divert goods from one Wasz to the other; they sold the same types of items on eBay, often under identical descriptions; and Laura Wasz admitted that she and her employee, co-defendant Michael Hockins, monitored Bruce's sales. Without doubt, the aggregate value of the stolen merchandise that the Waszes received and then sold on eBay was foreseeable to them both. What is disputed by the Waszes is how to calculate the total worth of the stolen merchandise that they fenced.

We may quickly dispose of the Waszes' threshold suggestion that the district court did not make adequate findings to support its determination that the loss resulting from their offense was within the range of $1 million to $2.5 million. The district court was presented with a fully developed record as to the parties' competing calculations of the loss amount. The district court's remarks at sentencing make patently clear not only that the court rejected the defendants' proposed loss calculation (*see* R. 251-2 at 4, 8, 16, 18-20), but that the court expressly adopted the findings of the PSR, which in relevant part tracked the government's loss calculation (*see id.* at 3, 21). The court's findings are more than adequate. *See*, *e.g.*, *United States v. Sykes*, 357 F.3d 672, 674 (7th Cir. 2004).

Echoing a point they made below, the defendants also suggest that the district court's loss calculation may have been based on inaccurate data. As noted, the Waszes auctioned more than 13,000 items on eBay during the time frame covered by the indictment. It is common ground among the parties that not all of these sales are within the scope of the indictment. Not all of the items the Waszes sold were stolen, for example, and that fact no doubt helps to explain why a number of the items that the Waszes auctioned off on eBay (*e.g.*, cars, jewelry, clothing, and computers) were not the types of goods offered for sale by the home

improvement retailers victimized by the Waszes' thieving co-defendants.

But any uncertainty as to the exact number and identity of the items that the Waszes sold pursuant to the charged scheme turns out to be immaterial to the dispute over the loss calculation. As noted above, in an effort to make a reasonable estimate of the loss attributable to the scheme, the government in its version of the offense had identified ten of the most frequently sold product lines from the list of the defendants' eBay sales that both Laura and Bruce admitted fencing during the time frame of the charged scheme and that corresponded with the types of items that the thieving co-defendants acknowledged having stolen and sold to the Waszes. R. 232, Government's Official Version of the Offense Ex. 2. Prior to sentencing, the government updated and expanded this list to include a total of fourteen product lines. These lines included Aquastar tankless water heaters; Genie garage door openers; Kohler, Mico, and Moen faucets; Basement Watchdog sump pumps; and Insinkerator garbage disposals. Sales of these product lines alone totaled over 6,500 items (roughly one-half of the defendants' total eBay auctions) and generated some $1.4 million in revenue to the Waszes. Using the typical prices at which the victimized retailers normally sold these items, the government put the total retail value of these goods at just over $2.2 million, and it cited this figure as a conservative but reasonable estimate of the loss. R. 203 at 14-15 & Gov. Ex. 5. The district judge explicitly agreed that this was a conservative estimate of the loss. R. 251-2 at 20. Notably, the defendants offered no reason why confining the loss estimate to these fourteen categories of stolen goods was not a reasonable approach to estimating the loss. For their part, as we discussed above, the defendants and their consultants parsed the list of total eBay auctions by the Waszes and eliminated the types of items that they believed were not

sold pursuant to the charged scheme. With those items eliminated, the total eBay sales by the Waszes amounted to $2,264,303.76. R. 205, Hopewell Report at 6. Again we point out that this total reflects the prices actually charged by the Waszes rather than the prices that would have been charged by the retailers. If this figure were adjusted to account for the fact that the Waszes were selling the stolen merchandise at prices averaging 62 percent of retail, the total retail value of the items stolen would amount to over $3.5 million. What these varying calculations make clear is that the merit of the Waszes' appeal turns not on which particular items are included in the loss calculation, but rather on how those items are valued.

The material question insofar as the loss calculation in this case is concerned is whether the items admittedly sold by the Waszes should be valued at their retail or a lesser value. "Loss" is defined as either the actual or intended loss, whichever is greater. § 2B1.1, comment. (n.2(A)). The parties agree that actual loss is the appropriate benchmark in this case. "Actual loss" is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense." *Id.* comment. (n.2(A)(i)). The loss need not be quantified with exacting precision; "a reasonable estimate" will suffice. *Id.*, comment. (n.2(C)); *see*, *e.g.*, *United States v. Spano*, 421 F.3d 599, 608 (7th Cir. 2005), *cert. denied*, 126 S.Ct. 1084, 1098 (2006). Where stolen goods are concerned, "the fair market value of the property unlawfully taken" is among the factors that the court should consider in placing a value on the loss. § 2B1.1, comment. (n.2(C)(i)).

The district court was on firm ground in using the retail value of the stolen merchandise fenced by the Waszes as the benchmark in estimating the loss. Other courts have recognized that when the stolen merchandise at issue has been taken from retailers, the price at which the retailers would have sold that merchandise serves as a reasonable estimate of the loss. *E.g.*, *United States v. Carrington*, 96 F.3d 1, 6 (1st Cir. 1996); *United States v. Lopez*, 64 F.3d

1425, 1427 (9th Cir. 1995); *United States v. Williams*, 50 F.3d 863, 864 (10th Cir. 1995); *United States v. Colletti*, 984 F.2d 1339, 1345 (3d Cir. 1992); *cf. United States v. Eyoum*, 84 F.3d 1004, 1007-08 (7th Cir. 1996) (approving use of retail value vis-à-vis illegally imported wildlife for purposes of Guidelines § 2Q2.1(b)(3)(A)). *Contrast United States v. Machado*, 333 F.3d 1225, 1228 (11th Cir. 2003) (appropriate valuation depends on context; error to use retail value where goods were stolen from wholesalers and were to be resold wholesale); *United States v. Hardy*, 289 F.3d 608, 613-14 (9th Cir. 2002) (same); *United States v. Warshawsky*, 20 F.3d 204, 213-14 (6th Cir. 1994) (same). In this case, the merchandise stolen was ready for sale and, in fact, had been offered for sale by the retailers; the Waszes' co-defendants literally took the merchandise off the retailers' shelves and out of the stores, bypassing the cashiers on their way out. The retailers would have already incurred virtually all of the costs associated with the sales of these items and were simply waiting to ring up the sales. In that regard, there is no dispute between the parties as to the prices at which the retailers would have sold the merchandise to willing customers. Under these circumstances, it was entirely reasonable for the district court to use the total retail value of the stolen items as a reasonable estimate of the loss. If anything, the defendants may have benefitted from the fact that the government relied on a conservative list of which items sold on eBay by the defendants were within the scope of the scheme.

We reject the defendants' suggestion that the loss instead be measured in terms of the gain that the Waszes realized on the sales of the stolen goods. *See* R. 205, Hopewell Report at 7. This approach would begin with the prices at which the Waszes actually sold the goods on eBay (prices which, as we have noted, were substantially below the usual retail prices of the goods) and deduct the costs of generating those sales (costs that presumably would

include the amounts that the Waszes paid their co-defen-dants for the goods). *See id.* Although this approach might accurately measure the amount the Waszes pocketed from their fraudulent activity, it does not constitute a reasonable estimate of the loss for a number of reasons. First, as the government correctly points out, the defendants' gain does not serve as an accurate measure of the loss where the fair market value of the stolen goods can be determined, as it can be in this case. *See* Guidelines § 2B1.1, comment. (n.3(B)); *see also United States v. Colello*, 16 F.3d 193, 197 (7th Cir. 1994) (proper inquiry focuses on victim's loss rather than defendant's personal gain). Second, the Waszes elected to sell the stolen items at substantially discounted prices; the fact that the items were stolen may well have factored into that decision. Third, the defendants were not operating a legitimate business but were dealing in stolen merchandise. The costs they incurred in obtaining and auctioning the goods, and the net amounts they realized on the sales, do not necessarily correspond with the harm inflicted on the retailers from whom the goods were stolen. *See Spano*, 421 F.3d at 607 ("The objective in calculating the loss inflicted by a crime is to determine how much worse off the victim was made by a crime, and so the costs incurred by the criminal *to commit the crime* are irrele-vant.") (citation omitted) (emphasis in original).

The defendants alternatively have proposed that the loss be measured by the gross profit that the retailer-victims would have realized on the sale of the stolen items, but we reject this approach as well. The premise behind this theory is that the retailers would have incurred certain costs in selling the stolen items that they did not incur when the items were stolen. Given the facts, we have some doubt as to the accuracy of this premise. The goods in question were stolen off the store shelves, so to speak. Consequently, it seems likely that the retailers would have already incurred many if not most of the costs that the

defendants propose to deduct from the loss calculation. In all likelihood, for example, the retailers would have already paid their suppliers for the items, and they would have already incurred the costs of stocking, distributing, pricing, advertising, and displaying the items for sale. The only cost that the retailers did not incur by virtue of the theft was the cost (if any) of completing actual sales transactions. Thus, using the gross profit strikes us as an inadequate measure of the loss to the extent that it excludes costs that the retailers already had incurred. That point aside, this approach can also be criticized (as the district court did) because it neglects to take into account costs to the retailers associated with the defendants' stealing. R. 251-2 at 8. Even assuming, for example, that the retailers were insured for theft, it could well be that the defendants' thievery resulted in higher insurance premiums. The retailers may have paid higher prices to obtain replacements for the goods stolen from their stores. And they may have also lost sales due to depleted inventories as well as the availability of the stolen goods on eBay at discounted prices.

For all of these reasons, we find no clear error in the district court's decision to value the loss associated with the Waszes' crime at between $1 million and $2.5 million. As that figure corresponds to a conservative estimate of the retail value of the stolen merchandise that the Waszes sold on eBay, it serves as a reasonable measure of the loss.

**B.**

The Waszes also challenge the district court's finding that they played an aggravating role in the offense for purposes of Guidelines section 3B1.1. As relevant here, the guideline specifies a four-level enhancement "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." § 3B1.1(a). The purpose of the aggravating-role enhance-

ment is to penalize more heavily those defendants who bear greater responsibility for crimes involving many individuals, both to reflect their greater degree of culpability and in recognition that such individuals are likely to profit more from the crime and pose a greater danger to the community and risk of recidivism. *See* § 3B1.1, comment. (background).

Whether the defendant qualifies as an organizer or leader for purposes of this guideline is a factual determination. There is no dispute here that the underlying criminal activity involved five or more individuals or was otherwise extensive. The Waszes instead contend that they are not properly characterized as organizers or leaders of the criminal activity. Factors that bear on that assessment include: the exercise of decisionmaking authority, the nature of the defendant's participation in the offense, the recruitment of accomplices, a claimed right to a larger share of the fruits of the crime, the degree of participation in the planning or organization of the offense, the nature and scope of the illegal activity, and the degree of control or authority exercised over other participants. § 3B1.1, comment. (n.4). No one of these factors is considered a prerequisite to the enhancement, and, at the same time, the factors are not necessarily entitled to equal weight. *E.g.*, *United States v. Matthews*, 222 F.3d 305, 307 (7th Cir. 2000). And although the nature and purposes of the enhancement certainly require the defendant to have played a leading role in the offense, he need not literally have been the boss of his cohorts in order to qualify for the enhancement, for a leader can influence others through indirect as well as direct means:

> A finding that the defendant functioned as an organizer or leader does not necessarily mean that he directly controlled other individuals. Rather, the defendant must have exercised some degree of control over others involved in the commission of the offense *or* he must have been responsible for organizing others for the

> purpose of carrying out the crime. Efforts to marshall other individuals for the purpose of executing the crime thus satisfy 3B1.1(a).

*United States v. Carson*, 9 F.3d 576, 585 (7th Cir. 1993) (internal quotation marks and citations omitted) (emphasis added); *see also United States v. Blaylock*, 413 F.3d 616, 621 (7th Cir. 2005); *United States v. Hanhardt*, 361 F.3d 382, 393-94 (7th Cir. 2004), *cert. granted & j. vacated on other grounds*, 543 U.S. 1097, 125 S. Ct. 994 (2005); *United States v. Fones*, 51 F.3d 663, 670 n.5 (7th Cir. 1995); *United States v. Mustread*, 42 F.3d 1097, 1104 (7th Cir. 1994); *United States v. Guyton*, 36 F.3d 655, 662 (7th Cir. 1994). Because the district court's assessment of the defendant's role in the offense constitutes a factual determination, we review it for clear error. *E.g.*, *Blaylock*, 413 F.3d at 618.

The Waszes characterize their relationship with their thieving co-defendants as a symbiotic joint venture for which they bear equal but no greater responsibility. The Waszes emphasize that long before they were introduced to their thieving co-defendants, those co-defendants were in the business of stealing goods from home improvement retailers, that they (the Waszes) simply functioned as an outlet for the stolen merchandise, and that to the extent their co-defendants took any direction from them (e.g., as to the types of goods they wanted stolen), they did so as any supplier eager to please his buyer would. The government, on the other hand, sees the Waszes as being more culpable than their co-defendants because (a) they owned and managed the pawn shops, which served as a front for the fencing operation; and (b) they organized their co-defendants in the sense that they told the thieves what to steal, occasionally fronted money to cover the costs of their out-of-state trips, and instructed the thieves to remove price tags and complete false invoices to help conceal the stolen nature of the goods. On review of the record, we conclude

that the district court was not clearly erroneous in ascribing an organizing or leadership role to the Waszes.[5]

There is, we should clarify at the outset, no issue as to whether one of the Waszes but not the other qualifies for the enhancement. Their roles in the offense were similar if not identical: both were involved in the procurement of stolen merchandise from their co-defendants, both received merchandise from their co-defendants (which they divided between themselves), both took steps to maintain a fictitious paper trail to conceal the stolen nature of the merchandise, and both auctioned off the stolen merchandise on eBay. The only material distinction between the two was that Laura Wasz had an employee, co-defendant Hockins, who worked at a pawn shop that she owned and who, at her behest, regularly engaged in a number of activities in furtherance of the charged scheme. Her control of Hockins' activities certainly lends additional support to the notion

---

[5] The government represented below, and has repeated the assertion here, that the Waszes recruited the thieving co-defendants to join the steal-to-sell scheme. If true, that would support the finding that the Waszes were leaders or organizers. *See* § 3B1.1, comment. (n.4) (citing "the recruitment of accomplices" as an indicum of leadership); *see also*, *e.g.*, *Blaylock*, 413 F.3d at 621 (citing the defendant's recruitment of accomplices, *inter alia*, as evidence that she was the "mastermind" of the crime). However, the Waszes have disputed the notion that they recruited anyone. They insist that they were introduced to the thieving co-defendants, who were already in the business of stealing, and came to a mutually satisfactory agreement as to how the Waszes might help their co-defendants dispose of the stolen goods. The district court does not appear to have rendered a finding on this particular point. And because we find that other circumstances support the district court's determination that the Waszes were leaders or organizers, we see no need to address the subject of recruitment.

that she acted as an organizer or leader in this scheme.[6] But the remainder of our analysis shall focus on the evidence supporting the enhancement for both defendants.

First, the offense to which the Waszes pleaded guilty was wire fraud, and the underlying fraud was the passing off of stolen goods as legitimate to unsuspecting eBay customers. As the purveyors of the merchandise, the Waszes were, of course, at the forefront of that fraud. Their co-defendants had nothing to do with the eBay sales: by standing arrangements with their co-defendants, the Waszes typically paid cash for the stolen goods delivered to them in amounts corresponding to a set percentage (33 to 40 percent) of the retail value of the goods; how and at what prices the Waszes sold the goods was entirely up to them.

Second, vis-à-vis their thieving co-defendants, the Waszes provided an outlet for the stolen merchandise that the thieves sorely needed. Due to changes in the merchandise return policies of their retailer victims, the thieving co-defendants were finding it increasingly difficult to steal goods and then return the items to the stores for cash refunds. As the owners of pawn shops, the Waszes had a ready-made cover for the handling of stolen merchandise.

---

[6] Arguably, Laura Wasz's control over a single participant in the scheme would suffice to qualify her for the enhancement. The commentary to section 3B1.1 states that "the defendant must have been the organizer, leader, manager or supervisor of one *or* more other participants." U.S.S.G. § 3B1.1, comment. (n.2) (emphasis added). Thus, as we recognized in *Blaylock*, although the crime must have involved at least five participants or have been otherwise extensive in order for the organizer/leader enhancement to apply, the defendant need not have controlled (directly or indirectly) more than one of the other participants. 413 F.3d at 619-21. In any event, for the reasons we discuss below, the record supports a finding that the Waszes played a leadership role as to all of their co-defendants.

By agreeing to buy the stolen merchandise from the thieves and sell it on eBay, the Waszes enabled their co-defendants to circumvent the problem of store returns, supplied them with a guaranteed income on their thefts, and in these ways enabled their co-defendants to continue stealing and to do so on a relatively large-scale basis. Thus, even as to the thieving aspect of the scheme, the Waszes played a key facilitating role.

Third, one may reasonably infer from the evidence that the Waszes to a material degree did direct the efforts of their co-defendants. The Waszes frequently specified what items they wanted their co-defendants to steal, on occasion naming the brands, model numbers, and quantities of the items they wanted. When their co-defendants embarked on interstate road trips to steal merchandise, the Waszes occasionally gave them cash to help defray the expenses of the expeditions. While on such trips, the co-defendants would check in with the Waszes by telephone to apprise them of their progress. Finally, the Waszes instructed their co-defendants to remove the price tags and other identifying marks from the stolen merchandise and to complete fictitious invoices for the merchandise, two steps that aided the Waszes' effort to disguise the illicit source of the goods they were selling on eBay.

Collectively, these facts permit the inference that the Waszes bear a greater degree of responsibility for the overall effort to steal merchandise from retailers and sell it to unsuspecting buyers on eBay than do their thieving co-defendants. Not only were the Waszes solely responsible for the planning and execution of the sales end of the scheme, but they gave material direction to their co-defendants with respect to the thieving end of the scheme; the stolen merchandise did not simply arrive at their doorstep on a take-it-or-leave-it basis. We appreciate the Waszes' point that it may not be at all unusual for a thief to try to accommodate his fence by stealing the types of goods that

the fence has a market for, but the Waszes' direction of their co-defendants went beyond merely supplying their co-defendants with a wish list: they placed rather detailed orders for desired merchandise, had standing arrangements to pay specified amounts for stolen merchandise, helped to fund their co-defendants' theft expeditions, were kept apprised of those road trips, and solicited the thieves' cooperation in their own efforts to create falsified paperwork for the merchandise. It is reasonable, in short, to view the relationship between the Waszes and their co-defendants not simply as a symbiotic and mutually profitable exchange between two autonomous groups (thieves and fences) but rather as a unitary scheme (steal to sell) with the Waszes at the helm. Their actions reflect the exercise of planning and decisionmaking authority, a culpable involvement in all aspects of the crime, and a guiding influence over the other participants in the offense.

## III.

Finding no clear error in either the loss calculation or the finding that Bruce and Laura Wasz were organizers or leaders of the criminal offense to which they pleaded guilty, we AFFIRM their sentences.

A true Copy:

    Teste:


                _____
                *Clerk of the United States Court of*
                *Appeals for the Seventh Circuit*