In the

# United States Court of Appeals
## For the Seventh Circuit

No. 06-2612

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ROBERT BROWNELL,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 05-CR-013—**Charles N. Clevert, Jr.**, *Judge.*

ARGUED DECEMBER 5, 2006—DECIDED JULY 25, 2007

Before FLAUM, WOOD, and EVANS, *Circuit Judges.*

WOOD, *Circuit Judge.* After Robert Brownell pleaded guilty to charges of conspiracy to commit mail fraud and wire fraud, the district court sentenced him to 240 months' imprisonment and three years' supervised release, and ordered him to pay nearly $7 million in restitution. Brownell appeals his sentence, arguing that the district court erred in its calculation of intended loss and in applying the "leader or organizer" enhancement for sentencing purposes. The latter argument is easily rejected, but we conclude that the district court's finding of intended loss is not adequately supported by the record. We therefore vacate the sentence and remand for resentencing.

**I**

Bielinski Brothers is a residential construction business owned by brothers Frank and Harry Bielinski. In 1995, the Bielinskis hired Brownell to be the company's Acquisition and Development Manager. In 2001, Brownell was promoted to Chief Executive Officer, but three years later, in July 2004, he was fired for exceedingly good cause.

It turned out that Brownell had been using his position at Bielinski Brothers to authorize payment of numerous fraudulent invoices and expenses. He obtained loans in the name of the business and its owners by forging documents; he even fraudulently notarized the owners' signatures on loan documents. He procured four fraudulent escrow agreements in Bielinski Brothers's name, which falsely represented that the business had deposited funds with its law firm as security for payment for certain transactions. And Brownell caused Bielinski Brothers to pay unnecessary assignment fees to third parties, with which Brownell was secretly involved, to obtain the rights to purchase real estate. The total loss to Bielinski Brothers was in the millions of dollars.

One significant aspect of the conspiracy involved transactions between Mann Brothers, Inc., an excavating company owned by Robert Mann, and Bielinski Brothers. Mann Brothers submitted inflated invoices to Bielinski, and then Mann and Brownell split the excess proceeds. Other invoices from Mann covered expenditures for illegal campaign contributions and expenses personally benefitting Mann and Brownell. Finally, Brownell and Mann used one of the fraudulent escrow agreements to help Mann's company. The escrow agreement falsely represented that Bielinski Brothers had deposited approximately $1.67 million with its law firm to secure payment for services that Mann Brothers had performed

for it. The agreement allowed Mann Brothers to misrepresent its financial stability to its bank.

## II

Brownell's only arguments on appeal relate to his sentence. He claims first that the district court erred in its calculation of intended loss for purposes of computing the advisory range under the Sentencing Guidelines. Brownell objects to three items on the ground that they do not represent either actual or intended loss: (1) the fourth of the four unfunded escrow agreements; (2) the part of the credit line used to make a real estate purchase; and (3) certain assignment fees that Bielinski Brothers paid. A district court's determination of loss under the Guidelines is a question of fact that is reviewed for clear error. *United States v. Mantas*, 274 F.3d 1127, 1131 (7th Cir. 2001). To the extent that Brownell is also disputing how the term "loss" under the Guidelines should be defined, he is raising a question of law that we review *de novo*. *United States v. Sensmeier*, 361 F.3d 982, 986 (7th Cir. 2004).

In *United States v. Wasz*, 450 F.3d 720 (7th Cir. 2006), we held that "'[l]oss' is defined as either the actual or intended loss, whichever is greater." *Id.* at 727. The Guidelines define "actual loss" as "the reasonably foreseeable pecuniary harm that resulted from the offense," and "intended loss" as "the pecuniary harm that was intended to result from the offense . . . [including] pecuniary harm that would have been impossible or unlikely to occur." U.S.S.G § 2B1.1, Application Note 3(A). In a conspiracy case, this court has held that a co-conspirator is responsible for the losses that were intended by the conspiracy and that were reasonably foreseeable to him. *United States v. Sliman*, 449 F.3d 797, 801-802 (7th Cir. 2006) (citing Application Note 2 to U.S.S.G. § 1B1.3).

**A**

Applying these definitions, the district court decided to include the $1.67 million that was pledged to the fourth unfunded escrow agreement in its loss calculation. Brownell argues that because the escrow agreement was never funded and was ultimately closed, that amount never became an "intended loss."

It is unclear from the record whether Mann Brothers performed any actual work for which Bielinski Brothers owed it some or all of the $1.67 million pledged. Brownell states that the escrow agreement was "to reflect work performed by Mann Brothers on several Bielinski projects" and "was used to procure loans for Bielinski Brothers projects." We question how earmarking $1.67 million to pay another entity would help any business to secure loans on its own behalf, but the plausibility of this claim does not change our analysis. The government characterizes the escrow agreement as a means of "deflect[ing] concerns by [Mann Brothers's] bank about the status of its outstanding receivables from Bielinski Brothers." The PSR states that $1.28 million of the $1.67 million "was for work Mann Brothers had purportedly done on a project known as Grandview Plaza," but it stops short of informing the court whether Mann Brothers performed work in that amount or more for Bielinski Brothers.

If, or to the extent that, the fourth escrow agreement pledged Bielinski Brothers's funds to pay non-fraudulent receivables for services actually rendered by Mann Brothers to Bielinski Brothers, it is not properly included in the loss computation for sentencing purposes. To the extent, however, that the agreement pledged Bielinski's company funds to pay receivables for services that Mann Brothers never rendered, or fees that exceeded the worth of Mann's work, that amount is properly included in the

calculation of intended loss. It is reasonably foreseeable that this pledge could lead to a demand for payment by Mann Brothers from Bielinski Brothers for the amount of the unearned funds. This escrow agreement was the subject of ongoing litigation at the time of the loss calculation. It is well within the realm of possibility that the court may have ordered damages equal to the portion of the $1.67 million that was based on fraudulent receivables. The district court easily could have concluded that this litigation was reasonably foreseeable to Brownell, a member of the broader conspiracy. *Sliman*, 449 F.3d at 801-02.

Because the record does not show whether any portion of the $1.67 million represented legitimate receivables, and if so, how much, we remand that question to the district court, so that it can make the necessary finding of fact. We note in this connection that loss calculations for sentencing purposes do not require the same precision as loss calculations to determine a defendant's guilt. See *United States v. Sriram*, 482 F.3d 956, 960 (7th Cir. 2007) ("When guilt beyond a reasonable doubt is duly determined, picking a sentence within the statutory range [based on the loss caused by the defendant] to punish the defendant for his crime does not require as much precision as the initial determination that he in fact committed the crime.").

**B**

Brownell next argues that the $1.56 million in credit that he obtained to purchase the Harrison Lakes property should not be counted as intended loss for sentencing enhancement purposes. To respond to this point, we must look at the provisions in the Guidelines that offer the defendant some credits against loss. Application Note 3(E)

to U.S.S.G. § 2B1.1, entitled "Credits Against Loss," states that

> [l]oss shall be reduced by the following: (i) The *money returned*, and the fair market value of the *property returned* and the *services rendered*, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected. The time of detection of the offense is the earlier of (I) the time the offense was discovered by a victim or government agency; or (II) the time the defendant knew or reasonably should have known that the offense was detected or about to be detected by a victim or government agency. (ii) In a case involving collateral pledged or otherwise provided by the defendant, the amount the victim has recovered at the time of sentencing from disposition of the collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral at the time of sentencing.

(emphasis added).

In opposing any credit, the government relies on this court's decision in *United States v. Lauer*, 148 F.3d 766, 768 (7th Cir. 1998). In *Lauer*, we held that

> the amount of the intended loss, for purposes of sentencing, is the amount that the defendant placed at risk by misappropriating money or other property. That amount measures the gravity of his crime; that he may have hoped or even expected a miracle that would deliver his intended victim from harm is both impossible to verify and peripheral to the danger that the crime poses to the community. *Maybe if he returns part of the money or property to the victim before the crime is detected (not after . . .) he should get a break in sentencing in order to encourage such behavior. The cases are divided on that question. . . .* The disagree-

ment is immaterial here, because [the defendant] is not arguing that the amount of the loss should be reduced on the basis of money that he returned before he was caught. . . .

*Id.* (emphasis added). As we read this passage, it reaffirms that intended loss can be measured by "the amount that the defendant placed at risk," but it does not extend this holding to cases where the money was returned before the crime was detected.

This court addressed the "credit against loss" provision of § 2B1.1, Application Note 3(E)(i), in *United States v. Hausmann*, 345 F.3d 952, 960 (7th Cir. 2003). After quoting Application Note 3(E)(i), *Hausmann* notes that "this Circuit has adopted a 'credit against loss' approach to the calculation of fraud victim loss amounts for sentencing guideline purposes" because the Sentencing Guidelines "'call for the court to determine the net detriment to the victim, rather than the gross amount of money that changes hands.'" *Hausmann*, 345 F.3d at 960 (citing *United States v. Jackson*, 95 F.3d 500, 506 (7th Cir. 2000)). Several other circuits have also found that Application Note 3(E)(i) permits a credit against intended loss for "money returned." See *United States v. Geeslin*, 447 F.3d 408, 410-11 (5th Cir. 2006) (permitting such a credit based on Application Note 3(E)(i)); *United States v. Nichols*, 416 F.3d 811, 819 (8th Cir. 2005) (same); *United States v. Rothwell*, 387 F.3d 579, 584-85 (6th Cir. 2004) (same).

This is not to say that a credit is always required when a loss is partially repaid. The defendant must make her repayment before the crime is uncovered. See *United States v. Rettenberger*, 344 F.3d 702, 708-09 (7th Cir. 2003) (calculating intended loss based on entire fraudulent scheme had it continued rather than the loss suffered by the date of the scheme's discovery); see also *United States v. Swanson*, 360 F.3d 1155, 1169 (10th Cir. 2004) (holding

that unlike repayment of loss before the crime is detected, repayment of loss after the crime is detected does not discount loss calculation for sentencing purposes).

In this case, if it were clear that Brownell repaid the $1.56 million in full before he was caught, then that amount would not properly have been included in the loss calculation. The record, however, does not allow us to resolve the question one way or the other. The timing does look suspicious. Brownell repaid the loan by personally buying the property purchased with the loan from Bielinski Brothers and then (it appears) authorizing repayment of the bank by Bielinski Brothers. This occurred in July 2004, around the same time Brownell was fired; Brownell was indicted shortly thereafter, in October 2004. The timing suggests that he realized that his fraud was about to be discovered; if so, then he is not entitled to use the repayment as a "credit against loss." Rather than attempt to resolve the factual question whether the government proved by a preponderance of the evidence that Brownell knew or should have known that his fraud had been or was about to be discovered, however, we prefer to remand this question to the district court for its assessment of the whole record.

The district court was correct, however, insofar as it concluded that at least some of the $1.56 million belonged in the loss calculation. Brownell's lawyer told the district court at sentencing that "all but a few thousand [dollars of the loan] was paid back." Therefore, at least a small, undetermined amount of the loan is properly part of the loss calculation, even if the repayment offsets the bulk of it. In addition, if at the proper time of loss calculation Brownell had not yet purchased the property from Bielinski Brothers, then the district court would need to determine the value of the collateral that Bielinski Broth-

ers held to secure the loan and to award a credit for that amount.

## C

Brownell also challenges the district court's inclusion in the loss calculation of the $ 1.8 million in assignment fees, but we see no error in that decision. Brownell argues that "the Government did not submit proof that but for defendant's involvement the assignment fees would never have been paid." He admits, however, that he "had a side agreement, unknown to Bielinski Brothers, with Redmond Construction." Bielinski Brothers ultimately acquired three properties after paying significant assignment fees to entities in which Brownell had a financial stake. Yet Bielinski Brothers appears to have had the opportunity to buy those properties directly. Based on Brownell's position at Bielinski Brothers, the timing of the three deals, and Brownell's financial gain as a result of the assignment fees, the district court was entitled to conclude that Bielinski Brothers would not have had to pay these fees had it not been for Brownell's fraudulent schemes.

## III

Brownell also finds fault with the district court's application of the organizer/leader enhancement to his sentence. Whether a district court properly determined a defendant's level of involvement in a particular scheme is reviewed for clear error. *United States v. Hogan*, 54 F.3d 336, 339 (7th Cir. 1995).

Under U.S.S.G. § 3B1.1, a defendant's advisory Guidelines sentence can be increased based on the significance of her involvement in a criminal scheme. U.S.S.G. § 3B1.1 prescribes a four-level enhancement when a defendant is

the leader or organizer of a criminal scheme involving five or more participants, and a three-level enhancement when a defendant is the manager or supervisor of a criminal scheme involving five or more participants. The district court concluded, based on the PSR, that Brownell was a leader/organizer under § 3B1.1(a), and gave him a four-level enhancement. Brownell argues that he should have been assessed only a three-level enhancement under § 3B1.1(b) because his role was only that of a manager/supervisor. He disputes only the significance of his involvement, not the fact that the number of participants exceeded five.

Application Note 4 to U.S.S.G. § 3B1.1 directs the district court to consider "the exercise of decision making authority, the nature of [the defendant's] participation in the commission of the offense, the recruitment of accomplices, a claimed right to a larger share of the fruits of the crime, the degree of participation in the planning or organizing of the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over other participants." In *United States v. Wasz*, *supra*, this court held that "[n]o one of these factors is considered a prerequisite to the enhancement, and, at the same time, the factors are not necessarily entitled to equal weight." 450 F.3d at 729. In affirming the district court's application of the four-level leader/organizer enhancement in that case, *Wasz* highlighted the authority that the defendants exercised and concluded that they "b[ore] a greater degree of responsibility for the overall effort" and that "[t]heir actions reflect[ed] the exercise of planning and decisionmaking authority, a culpable involvement in all aspects of the crime, and a guiding influence over the other participants in the offense." *Id.* at 732. The *Wasz* court also noted that

[a] finding that the defendant functioned as an organizer or leader does not necessarily mean that he directly controlled other individuals. Rather, the defendant must have exercised some degree of control over others involved in the commission of the offense or he must have been responsible for organizing others for the purpose of carrying out the crime.

450 F.3d at 730 (internal quotation marks and citations omitted).

Brownell relies on a Tenth Circuit decision, *United States v. Johnson*, 4 F.3d 904 (10th Cir. 1993), to show that he belongs on the lower "manager/supervisor" side of the line, but *Johnson* does not require that outcome. Neither this court nor the Tenth Circuit has held that a leader/organizer must have complete control over all the participants. In *United States v. Melendez*, we upheld a leader/organizer enhancement for a drug distributor involved in a drug organization's scheme, where the defendant "instructed and supervised" at least six specific participants in the scheme (out of more than twenty participants). 467 F.3d 606, 609 (7th Cir. 2006). The court viewed this "mountain of evidence . . . more than adequate to affirm the district court's finding that [the defendant] was a leader or organizer." *Id.*

After acknowledging *Johnson* and the factors found in Application Note 4 to § 3B1.1, Brownell admits that he was "at the center of the various schemes." That alone, he urges is not enough. He claims that "it is not clear that he was directing all of the other participants," and that "several of [the other participants] profited much more from the various schemes than Defendant." This misconstrues both the nature of the crime to which he pleaded guilty and the strength of the government's evidence. Brownell pleaded guilty to participating in a single, overarching conspiracy to defraud. Within that conspiracy,

a connected series of transactions took place. One individual had control over the whole scheme: Brownell.

The district court, accepting the conclusions of the PSR, found that Brownell had direct or indirect financial control over all of the participants. Brownell colluded with Mann to approve inflated invoices submitted to Bielinski Brothers by Mann's company. Brownell instructed Mann for "which projects Mr. Mann should submit inflated invoices and the amount by which Mr. Mann should inflate the invoices." Brownell "agreed to supplement [alleged co-conspirator] Mr. [Brian] Carney's official salary at Bielinski Brothers." Brownell authorized funds from Bielinski Brothers to pay Carney and another employee to leave Bielinski Brothers and work with another real estate company for the purposes of various frauds against Bielinski Brothers. Brownell set up another agreement with alleged co-conspirator Norman Hanson, under which Hanson would bill Bielinski Brothers for work that his company performed for Brownell's private projects (*i.e.*, those unrelated to Bielinski Brothers) and Brownell approved the payments. Brownell set up a similar arrangement with Bielinski Brothers employee Jack Broughton. Brownell worked with Bielinski Brothers's outside counsel, another alleged co-conspirator, to purchase privately a condominium in Florida and used Bielinski Brothers funds to make the first two installments on the down payment. Brownell also set up a series of fraudulent transactions on his own using Bielinski Brothers funds or collateral. And this was only a portion of Brownell's fraudulent activity. The district court was certainly entitled to find, based on this record, that Brownell's role, as well as his location, was so central that he was properly treated as a leader of the scheme.

## IV

Although we reject Brownell's challenge to the district court's use of the "leader/organizer" enhancement under the Sentencing Guidelines, we REMAND to the district court so that it can make the factual determinations we have identified for the computation of the intended loss, and, based on the new computations, select an appropriate sentence.

A true Copy:

      Teste:

 

 

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*