NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued April 23, 2008
Decided June 26, 2008

**Before**

RICHARD D. CUDAHY, *Circuit Judge*

JOHN L. COFFEY, *Circuit Judge*

JOHN DANIEL TINDER, *Circuit Judge*

No. 07-3363

| | |
|---|---|
| UNITED STATES OF AMERICA, | Appeal from the United States District |
| *Plaintiff-Appellee*, | Court for the Northern District of |
| | Illinois, Western Division. |
| *v.* | |
| | No. 06 CR 50063 |
| NEVIN GILLETTE, | |
| *Defendant-Appellant*. | Philip G. Reinhard, |
| | *Judge*. |

**ORDER**

Nevin Gillette, a licensed securities broker, convinced his clients to invest in a multi-million dollar Ponzi scheme. He pleaded guilty to one count of wire fraud, in violation of 18 U.S.C. § 1343, and one count of mail fraud in violation of 18 U.S.C. § 1341. He was sentenced to 132 months' imprisonment, within the applicable guidelines range of 121 to 151 months' imprisonment. On appeal, Gillette argues that the district court erroneously determined that he had failed to repay one of his investors $360,000 and thus miscalculated the guidelines range. Because the district court reasonably calculated the amount of damages caused by Gillette's scheme, we affirm his sentence.

After an investigation by Illinois securities regulators, Gillette pleaded guilty to one count of wire fraud and one count of mail fraud. In the plea agreement, Gillette admitted to the following facts. Gillette operated two securities brokerage corporations, Executive Marketing Services of Northern Illinois (EMS) and Diversified Financial of Illinois, and he served as an officer for both corporations. Between 1999 and August 2006, he told numerous clients that he would invest their funds in GIC, a company he represented as a low risk oil and gas venture. In reality, Gillette never invested the funds; instead he used them for personal and business expenses as well as to perpetuate a Ponzi scheme in which he made payments to previous investors in GIC, thereby deceiving them into believing that their investments had been profitable.

Using the 2007 edition of the sentencing guidelines, the parties agreed on a number of calculations, including Gillette's base offense level, which was seven under U.S.S.G. § 2B1.1(b)(1)(K). The parties disagreed, however, on several issues that were ultimately resolved by the court at a sentencing hearing. The only issue relevant to this appeal is the amount of damages Gillette's Ponzi scheme caused his victims. The government argued that the damages slightly exceeded $7,000,000 and thus his offense level should increase by 20. *See* U.S.S.G. § 2B1.1(b)(1)(K). Gillette argued that the government could prove only that he was responsible for less than $7,000,000 in losses and he thus deserved only an 18-level increase. *See* U.S.S.G. § 2B1.1(b)(1)(K). The difference between their estimates of the damages hinged on the government's inclusion of a $360,000 payment from investor John Paul to EMS.

At the hearing, Ryan Kucera, an inspector for the United States Postal Service testified for the government on the amount of the victims' losses. Kucera presented numerous checks that Paul or his company, JP Ag Service, Inc., issued to EMS, including a May 2, 2006, check from JP Ag Service for $360,000 that was deposited in EMS's account at Sauk Valley Bank. It appears that six days later Gillette, through EMS, issued a $360,000 check to Paul that Paul endorsed and attempted to deposit into JP Ag Service's account at the same bank. Gillette contends that he should have received a credit on the loss calculation for that amount as a refund of a portion of Paul's total investment. But Inspector Kucera also presented a copy of a May 2006 bank summary of EMS's account that did not indicate that EMS actually paid that $360,000 into JP Ag Service's account. Kucera added that the bank summary would have noted the payment had EMS honored the check. Furthermore, the bank summary did show that on May 3 and 4, EMS made substantial payments to other accounts, which reduced EMS's account balance below the $360,000 needed to cover the refund check to JP Ag Service. Indeed, from May 5 until the end of the month, EMS's account balance remained below $12,000. Kucera said that he did not interview Paul himself but the morning before the hearing, Kucera showed the checks from JP Ag Service that he would present at the hearing to Paul's ex-wife, whom Paul still

employed.  Kucera testified that Paul's ex-wife confirmed that Paul wrote the checks for investment purposes, although it was unclear whether Kucera had obtained specific confirmation about the May 2 check for $360,000.

Gillette did not introduce anything to contradict Kucera's evidence that the May 8 EMS check was never honored.  Instead, Gillette argued that this check may have been honored or he may have used Paul's money for legitimate investment purposes, and that the government had not produced enough evidence to prove otherwise.  The district court found that Gillette had never refunded the $360,000 payment.  The court agreed with the government on the amount of the victims' losses, and determined Gillette's sentencing range to be 121 to 151 months' imprisonment.  The court sentenced him to 132 months' imprisonment, 3 years' supervised release as well as over $7,000,000 in restitution.  Had the court found that Gillette refunded the $360,000, his sentencing range would have been 97 to 121 months' imprisonment.

Gillette insists that the district court's determination that he never honored the $360,000 check to Paul was speculative because the bank records did not indicate whether Gillette succeeded or failed to transfer the money back to Paul.  Furthermore, Gillette argues that confirmation of the refund would have been easy to obtain—Kucera talked with Paul's ex-wife about his investments with Gillette the morning before the sentencing hearing.

For purposes of determining the appropriate sentencing range, the government must establish the amount of the loss by a preponderance of the evidence, and the district court may even consider otherwise reliable information that would not be admissible at a trial.  *United States v. Sliman*, 449 F.3d 797, 800, 802 (7th Cir. 2006).  The district court's calculation of the victims' losses must not include money that the defendant returned to the victims before the detection of the offense.  U.S.S.G. § 2B1.1; *United States v. Brownell*, 495 F.3d 459, 463 (7th Cir. 2007).  We review the district court's factual findings regarding the amount of loss for clear error, *United States v. Wasz*, 450 F.3d 720, 726 (7th Cir. 2006), which means we reverse only if we have a definite and firm conviction that the district court made a mistake, *United States v. Radziszewski*, 474 F.3d 480, 486 (7th Cir. 2007).  We uphold a reasonable estimate of the victims' losses; we do not require absolute precision.  *Radziszewski*, 474 F.3d at 486; *United States v. Peterson-Knox*, 471 F.3d 816, 822 (7th Cir. 2006).

In this case, the government presented enough evidence to show that Gillette had not refunded the $360,000 to Paul, even if further confirmation might have been helpful.  The May 2006 summary of EMS's account showed that transfers of a large amount of money in the days preceding Gillette's purported attempt to refund the $360,000 to Paul depleted the EMS account of the funds necessary to honor the check.  Furthermore, as       Postal Inspector Kucera testified, the summary of EMS's account would have noted the payment had Gillette actually transferred the $360,000 to Paul.  The government established by a

preponderance of the evidence that Gillette did not make payment on the check within a month after Paul endorsed it, and the district court was entitled to conclude that he never made payment, given that Gillette failed to produce evidence to the contrary. *See United States v. Gordon*, 495 F.3d 427, 431-32 (7th Cir. 2007) (defendant must present evidence to refute government's proof of loss). Gillette introduced nothing, even though he presumably had access to his own records, especially his bank records, before the hearing in order to verify which clients he had repaid. Therefore, the court reasonably included the $360,000 in its estimate of the damage caused by Gillette's Ponzi scheme.

AFFIRMED.