In the

# United States Court of Appeals

## For the Seventh Circuit

No. 05-3056

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MORAD ABU SLIMAN,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 CR 46-3—**John Darrah**, *Judge.*

ARGUED APRIL 11, 2006—DECIDED JUNE 5, 2006

Before FLAUM, *Chief Judge*, and WILLIAMS and SYKES, *Circuit Judges.*

FLAUM, *Chief Judge.* On June 10, 2003, a grand jury returned an eleven count indictment naming Defendant-Appellant Morad Abu Sliman ("Sliman")—along with co-defendants Badi Ahmed Salama, Rami Rabenu, and Mohammed Dacca—of conspiring to negotiate and attempting to negotiate counterfeit and forged checks, in violation of 18 U.S.C. §§ 2, 371, 513(a), and 1344. Sliman initially pled not guilty, but subsequently withdrew his plea and entered a "blind" plea of guilty to the seven counts of the indictment in which he was named. On June 21, 2005, the district court sentenced Sliman to 57 months' imprisonment and three years' supervised release. The district court found

that Sliman could have foreseen that the conspiracy's intended loss was more than $20,000,000. Sliman appeals, challenging his sentence. For the following reasons, we affirm.

## I. Background

Sliman is a citizen of Israel and at the time of his offense was 23 years old and living in Illinois. Sliman, his co-defendants, and various uncharged parties attempted to engage in a scheme that would enable them to receive cash from financial institutions by depositing counterfeit checks. The plan was as follows: Sliman and his co-defendants would print counterfeit checks on a home computer. Salama and another man would send the checks to two co-conspirators in Israel, Rabenu and "Mr. Gilaadi." Gilaadi would deposit the checks at his bank in Israel in an account opened in the name of RVAL, a company Gilaadi owned. Gilaadi would then withdraw the money in the total amount of the checks and share the cash with his co-schemers, in predetermined amounts. Sliman and his co-defendants also opened several bank accounts under fictitious names, printed checks made out to themselves, and attempted to negotiate counterfeit checks.

In furtherance of their scheme, Sliman and co-defendants Dacca and Salama operated a "counterfeit check factory" out of an apartment in Cicero, Illinois. When police searched the apartment, they found a computer and numerous counterfeit checks. The apartment was essentially empty except for these items. Police found a "check register" on the computer, which indicated that counterfeit checks worth $36,900,000 had been produced with and printed from the computer. Approximately $9 million worth of the checks listed on the register were found on the floor of the apartment, torn into pieces. Of the remaining approximately $28 million in checks, $2 million were

printed before Sliman joined the conspiracy. Of the $26 million in intact checks printed during the time Sliman participated in the conspiracy, approximately $16 million worth were made payable to RVAL. The remaining checks, totaling approximately $10 million, were made payable to aliases of Sliman, Dacca, and Salama.

The $16 million in checks made payable to RVAL consisted of four "batches" of checks. The co-defendants tried to send the first batch, worth approximately $4 million, to Israel via Federal Express on or around December 23, 2002. That batch was intercepted by customs. They then attempted to send a second batch, also worth approximately $4 million, to Israel via Federal Express on or around January 15, 2003. This batch was also intercepted by customs. At the time they sent the second batch, the co-defendants did not know that the first batch had been intercepted. The third batch, worth approximately $4 million as well, was printed on January 3, 2003 and transported to Israel by Rabenu. At the time Rabenu delivered the third batch, the co-defendants did not know the first two batches had been intercepted. Customs recovered approximately $1 million in checks from the third batch, after Sliman's co-conspirators presented the checks for payment overseas and the checks were forwarded to a bank in New York for processing. The fourth and final batch, worth another $4 million, was recovered by FBI agents on January 16, 2003, when they arrested Rabenu at O'Hare Airport while he was waiting to board a flight to Israel.

Sliman was charged with and plead guilty to conspiracy to make, utter, and possess counterfeit and forged securities of an organization with the intent to deceive, in violation of 18 U.S.C. §§ 371 and 2 (Count 1); possession of counterfeited and forged securities of an organization with the intent to deceive, in violation of 18 U.S.C. §§ 513(a) and 2 (Counts 2, 5, and 6); and participation in a bank fraud

scheme, in violation of 18 U.S.C. §§ 1344 and 2 (Counts 7, 10, and 11).

Sliman submitted a Plea Declaration stating the factual basis for his guilty plea. The Declaration contained the following relevant facts: During the summer of 2002 and continuing until January 2003, Sliman, as part of a conspiracy to defraud certain financial institutions, opened various bank accounts under false and fictitious names. On several dates between August 19, 2002, and the end of 2003, Sliman, Salama, and Rabenu "did knowingly make, utter and possess . . . counterfeited and forged" checks, drawn on various bank accounts, with intent to deceive others. Sliman, along with Salama and Rabenu, participated "in a scheme to send counterfeit checks to Israel, and . . . in furtherance of such scheme, [Sliman] and his co-defendants caused to be placed in certain express mail envelopes approximately $4,000,000 of counterfeit checks, the first mailing of which occurred on or about December 23, 200[2] and a second delivery of which occurred on or about January 15, 2003." Sliman's Plea Declaration does not mention the third and fourth batches of checks, which were worth approximately $4 million each.

At Sliman's sentencing hearing, the parties disagreed over whether Sliman's intended loss under U.S.S.G. § 2B1.1(b)(1), was approximately $36 million or $4 million. The parties also disagreed as to whether Sliman qualified for the minor role reduction under § 3B1.2 of the United States Sentencing Guidelines. The district court determined that the conspiracy's intended loss was over $20 million and that this loss was foreseeable to Sliman. The district court also denied Sliman's request for a minor role reduction. The district court found that Sliman qualified for a two-level downward adjustment for acceptance of responsibility and a one-level downward adjustment for timely notification of his intent to plead guilty. *See* U.S.S.G. § 3E1.1. The district court determined that Sliman's criminal history category

was a one and his total offense level was a 25. The Sentencing Guidelines provide for a sentencing range of 57 to 71 months. The district court sentenced Sliman to 57 months on each count, to be served concurrently, followed by three years' supervised release. Sliman is subject to deportation at the completion of his sentence.

## II. Discussion

All of the issues raised by Sliman on appeal center around one question: whether the district court erred by determining that Sliman and his co-conspirators intended their check counterfeiting scheme to result in a loss by its victims of more than $20 million. Sliman maintains that the intended loss was only $4 million, the amount Sliman admitted to in his Plea Declaration.

Under the Sentencing Guidelines, the "loss" caused by Sliman's fraudulent scheme is the "greater of actual loss or intended loss." U.S.S.G. § 2B1.1(b)(1), Application Note 3(A). If the loss exceeds $5,000, Sliman's base level offense increases incrementally, as follows:

| Loss Amount | Increase in Level |
|---|---|
| More than $2,500,000 | add 18 |
| More than $7,000,000 | add 20 |
| More than $20,000,000 | add 22 |
| More than $50,000,000 | add 24 |

U.S.S.G. § 2B1.1.

We review the district court's assessment of the amount of loss for clear error. *United States v. Berheide*, 421 F.3d 538, 540 (7th Cir. 2005).

### A. Standard of Proof

Sliman acknowledges that the district court is to use the preponderance of evidence standard of proof when finding facts that affect a defendant's sentence. *See, e.g.*, *United States v. Belk*, 435 F.3d 817, 819 (7th Cir. 2006). Sliman asks, however, that we reconsider our holdings in previous cases, and find that proof beyond a reasonable doubt is required. We decline to overturn our well established precedent on this point. The district court correctly applied the preponderance of evidence standard in determining the intended loss amount. *See, e.g.*, *United States v. Higgins*, 270 F.3d 1070, 1075 (7th Cir. 2001).

Additionally, the district court did not violate Sliman's right to due process by applying the preponderance of the evidence standard. Sliman's argument is the same one we have rejected in prior cases; namely, that his sentence violates due process because "the retroactive application of the remedial portion of the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), which held that the Sentencing Guidelines are merely advisory and thus permits the district court to sentence a defendant on the basis of facts neither found by the jury nor stipulated to by the defendant, unconstitutionally exposes him to a longer maximum sentence." *United States v. Cross*, 430 F.3d 406, 409-10 (7th Cir. 2005). As Sliman has not given us any reason why *Cross* and *United States v. Jamison*, 416 F.3d 538 (7th Cir. 2005), do not control the outcome of this case, we reject his argument. Sliman had fair warning at the time he was engaged in the check kiting scheme that his actions were illegal. He also had fair warning of the maximum sentence he could receive under the Guidelines. *Cf. Cross*, 430 F.3d at 410; *Jamison*, 416 F.3d at 539. His sentence therefore complies with due process.

### B. Legal Standard

Sliman argues that the district court applied the wrong legal standard in determining the intended loss amount under section 2B1.1 of the Sentencing Guidelines. The question of whether the district court applied the correct legal standard to determine the amount of loss is reviewed de novo.

Sliman argues that the district court erroneously applied the Guidelines' standard for determining "actual loss" when it should have used the standard for "intended loss." Application Note 3(A)(I) to section 2B1.1 defines "actual loss" as the "*reasonably foreseeable* pecuniary harm that resulted from the offense." (Emphasis added.) Application Note 3(A)(ii) defines "intended loss" as "(I) the pecuniary harm that was *intended* to result from the offense; and (II) includes intended pecuniary harm that would have been impossible or unlikely to occur." (Emphasis added.)

Sliman claims that it was error for the court to inquire whether the loss was "reasonably foreseeable" to him. Instead, according to Sliman, the district court should have looked at his intent. In the Plea Agreement, Sliman admitted that he had the intent to complete a $4 million check kiting scheme.

At Sliman's sentencing hearing, the district court explained that the "intended loss" was the amount of loss for which it was reasonably foreseeable to Sliman that the conspiracy was designed to cause. The district court determined that it was reasonably foreseeable to Sliman that the conspiracy's intended loss was in excess of $20 million.

We agree with the district court's finding. Sliman was a participant in a conspiracy, and thus his offense level is determined by examining all reasonably foreseeable acts and omissions of Sliman and his co-conspirators in furtherance of the jointly undertaken criminal activity. Application

Note 2 to section 1B1.3 of the Sentencing Guidelines provides that a defendant will be held accountable for the relevant conduct of others when that conduct is (1) in furtherance of a jointly undertaken criminal activity, and (2) reasonably foreseeable in connection with that activity. The district court therefore applied the correct legal standard in determining the intended loss amount.

**C. Check Register**

Sliman argues that the district court should not have relied on the "check register," which detectives found stored in the computer at the Cicero apartment, because the document does not have a sufficient indicia of reliability to be admitted as evidence. According to Sliman, the check register should have been excluded because it includes "hearsay statements as to dates, amounts, payees, etc. which the court relied on in making its factual determination." Sliman also maintains that the document is unreliable because it is unknown what computer hardware or software was used to generate the document; there was no testimony by a forensic examiner or FBI agent as to how the report was generated; there is no evidence as to how the dates were inserted on the checks; there is no evidence as to how the check numbers were inserted on the checks; and there is no evidence as to whether the checks listed on the register were "spoiled checks."

We find that the district court properly considered the check register in determining the intended loss amount. Sentencing Guideline 6A1.3(a) provides that, "[i]n resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy."

The district court did not err in finding that the check register had a sufficient indicia of reliability. The government presented evidence that in November 2002 and January 2003, Sliman purchased a "versa check" 2002 Home & Business Program, MICR toner, and a "Versa Check Rainbow (Economy) Pack 3000"—all items that can be used to create counterfeit checks. The items were shipped to Sliman's home address. Fingerprint reports showed that Sliman's prints were found on blank and printed check stock found at the Cicero apartment that the co-defendants were using to print counterfeit checks. The government recovered approximately $16 million in checks that were intended to go to into the RVAL bank account in Israel. Sliman's fingerprints were found on some of these checks, including on the fourth batch.

The government found another $9 million in torn checks on the floor of the apartment, and the district court properly excluded these checks from the intended loss amount. The district court also properly excluded the $2 million in checks that were printed before Sliman joined the conspiracy. The apartment contained a computer, check stock, torn checks, and little or nothing else. It appeared that the co-conspirators rented the apartment not to live in, but to use as a secure place to produce counterfeit checks. It also appeared that the co-conspirators did not throw away checks that they did not intend to use. The checks that were not torn were capable of entering the stream of commerce and being negotiated, whether or not a financial institution would be deceived by the counterfeits.

Finally, two of Sliman's co-conspirators admitted in their plea agreements that the intended loss amount for the conspiracy was greater than $20 million. We conclude that the district court did not err by determining that the check register contained a sufficient indicia of reliability.

**D.  Calculation of Intended Loss**

Sliman argues that the district court should have found that the intended loss amount was around $4 million, rather than the $26 million found by the district court. At Sliman's sentencing hearing, the district court determined that the intended loss amount was greater than $20 million, resulting in a 22-level increase from Sliman's base level offense of 6. The district court began its calculations by determining that the co-conspirators printed $36.9 million in counterfeit checks. This amount is equal to the total of the checks listed on the "check register" that was found in the apartment. From this amount, the district court subtracted $9 million, the total of the checks found torn up in the Cicero apartment. The district court also subtracted another $2 million to account for checks that were printed before Sliman began participating in the conspiracy in August 2002. The district court concluded that the intended loss amount was approximately $26 million.

Sliman argues that the intended loss amount was only $4 million. In his version of events, the co-conspirators printed and mailed one batch of checks, worth $4 million. When that batch was confiscated, the co-conspirators printed and mailed a replacement batch, worth $4 million. When the second batch was confiscated, they printed another replacement batch, which their Israeli co-schemers rejected because the denominations of the checks were too large. When the third batch was rejected, the co-conspirators printed another $4 million batch of checks, which was confiscated by FBI agents at O'Hare Airport. According to Sliman, the intended loss from the beginning of the conspiracy was only $4 million. It just took the co-conspirators four attempts to produce one batch of counterfeit checks.

The district court properly rejected this argument. Sliman's version of events omits several important facts. At the time the co-conspirators mailed the second batch of

checks, they were not aware that the first batch had already been confiscated. Nor did the co-conspirators know at the time they printed the third batch of checks that the second batch had already been confiscated, possibly indicating that the co-conspirators did not intend the later batches of checks to be replacements. Additionally, although Sliman argues that his co-conspirators in Israel rejected the third batch of checks (because they were printed in large denominations and were likely to raise suspicion), this batch was not destroyed. The co-schemers in Israel deposited some of the checks from the third batch, and those checks were confiscated when they were mailed to a New York bank for processing. Each of the four batches of checks contained different check numbers and denominations, also indicating that each new batch was not a replacement for the previous batch. Sliman's fingerprints were found on the fourth batch of checks.

The remaining approximately $10 million in counterfeit checks that were printed after Sliman joined the conspiracy, which Sliman does not discuss, were made payable to aliases of Sliman and his co-defendants Dacca and Salama. There is evidence that the co-defendants attempted to negotiate these checks. For instance, Sliman admitted in his Plea Declaration that he, Salama, and Dacca attempted to defraud financial institutions by depositing a $12,860 counterfeit check in Dacca's Bank One account.

Viewing the evidence as a whole, we find that the district court did not commit clear error by finding that the conspiracy's foreseeable intended loss was approximately $26 million.

### III.  Conclusion

For the foregoing reasons, we AFFIRM the district court's sentencing decision.

A true Copy:

   Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*

USCA-02-C-0072—6-5-06