In the

# United States Court of Appeals
## For the Seventh Circuit

No. 05-2902

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DANIEL GROVES, SR.,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Indiana, South Bend Division.
No. 04 CR 76—**Allen Sharp,** *Judge.*

ARGUED JANUARY 13, 2006—DECIDED NOVEMBER 22, 2006

Before RIPPLE, KANNE, and ROVNER, *Circuit Judges.*

ROVNER, *Circuit Judge.* Daniel Groves was charged in a two-count indictment under the "felon in possession" statute with possessing a firearm and possessing ammunition. *See* 18 U.S.C. § 922(g)(1). A jury convicted him on both counts. He challenges his conviction on the firearm count on the ground that the evidence was insufficient to demonstrate that the firearm traveled in interstate commerce. On the ammunition count, he faults the district court for denying his motion to suppress evidence obtained in a warrantless search of his apartment. He also complains of evidentiary

errors and mistakes in calculating his sentence. This is one of those rare cases in which a defendant succeeds in demonstrating that the evidence was insufficient to prove an element of the crime. We therefore reverse in part, affirm in part and remand to the district court for further proceedings consistent with our opinion.

## I.

At approximately 9:40 p.m. on July 5, 2004, South Bend resident Elton Chavez called 911 to report that gunshots were being fired from a building across the street from his residence. Chavez lived in Dismas House, a halfway house for drug addicts and felons. Daniel Groves, the defendant, lived across the street from Dismas House, in an apartment complex. The 911 call was recorded and was played for the jury. Chavez told the 911 operator, "There's a guy across the street shooting up a shotgun." He told the operator that the man aimed the gun at Dismas House and that the porch light was on at the building across the street. The operator asked Chavez if he knew who the man was and he replied, "No." The operator then said, "You don't know? Do you know if he lives there?" and Chavez replied, "I'm guessing." Chavez told the operator that he initially thought the blasts were fireworks but that he "bent down and looked underneath the tree and sure enough this guy's got a shotgun, cocking it, and he wasn't even aiming it at the sky, he was aiming it over towards our house." 911 Tr. at 1.[1] Although two other people (a female resident of Dismas House and her male visitor) were with Chavez on the porch of Dismas

---

[1]  Neither the tape nor the transcript of the 911 call appear in the certified record on appeal. Groves included a copy of the transcript in the appendix filed with his opening brief, embedded between pages 23 and 24 of Volume I of the trial transcript. We will refer to this transcript as the "911 Tr."

House, only Chavez claimed to have seen the gunman. The male visitor later testified that he could not see the shooter because of the darkness. All three ran into Dismas House after the second shot was fired.

South Bend police officers arrived quickly after the call was made. They first stopped to talk to Chavez who told them that the man with the gun was wearing black and that he fired the shots from the porch across the street where a porch light was on. At trial, he conceded that because it was dark, he could not tell what clothes the shooter was wearing, but that the clothing was black. He also acknowledged at trial that there was a tree blocking his line of vision from the porch of Dismas House to the porch of the building across the street, but maintained he could lean to the left and see the man with the shotgun. The distance between the two porches was approximately 220 feet. After talking to Chavez and the two people who had been with him when the shots were fired, the officers proceeded to the building across the street.

The first officer on the scene, Corporal Taylor, approached Groves, who was standing outside the apartment building wearing a white shirt and dark pants. Taylor asked Groves if he had seen anyone shooting a gun. Groves denied seeing a gun and told Taylor that he had been shooting off fireworks. Taylor asked Groves where his gun was and Groves responded that he never had a gun. In response to Taylor's questioning, Groves pointed out the porch to his apartment and admitted he was felon. When Taylor then asked Groves if the police could search his apartment, Groves said "No" and told the officer to get a warrant. Taylor testified that Groves was "adamant that we could not go in the apartment" and so the officers began to search in the grass for evidence of discharged firearms. Taylor found three 20-gauge shell casings in the grass near the porch. Taylor again approached Groves, told him he had found the shell casings and asked again if he could search the apartment.

According to Taylor, Groves "adamantly said no, and he said to go get a search warrant." The officer then returned to Dismas House, showed Chavez the three shell casings, and said, "Yeah, you're right. He's shooting a shotgun."[2]

The officers then applied for a warrant to search Groves' apartment but a federal magistrate denied the application. On July 21, a few weeks after the incident, police officers returned to Groves' apartment building. Special Agent Lucas Battani, a South Bend police officer and member of the Project Disarm Task Force, interviewed Darlene Smith, another resident of the building that morning. According to Agent Battani, Smith told the officers that Groves lived in Apartment 3 with Shaunta Foster, and that Foster had lived there for approximately five months. Agent Battani also asked Smith about Groves' work schedule and determined that he would be at work later that day. Agent Battani returned to the apartment building at 1:30 p.m. with two other members of Project Disarm, including a local officer from the Elkhart Police Department and a federal special agent from the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). The trio knew from the interview of Smith that Groves would be away at work at that time. Agent Battani had also researched Shaunta Foster in the interim and had determined that a woman by that name was subject to a body attachment warrant. He had not

---

[2] There were a few minor discrepancies between the officer's testimony at trial and the report he filed immediately after this incident. For example, in the report, Taylor stated that when he first approached the house across the street from Dismas House, he found Groves shooting off fireworks; at trial he stated that Groves was standing outside the apartment building and told him he had been shooting off fireworks. None of these discrepancies are material to the issues on appeal and so we need not consider them further.

determined whether the Shaunta Foster living with Groves was the same Shaunta Foster associated with the warrant.

The officers went to Groves' apartment that afternoon to attempt to obtain consent to search from Foster, having been refused by both Groves and a federal magistrate. Both Battani and Foster testified at a suppression hearing; although there were some points of agreement, there were also several important differences in their stories about what happened that day. We begin with Agent Battani's account. Agent Battani knocked on Groves' door and when Foster answered, he asked her to step outside to speak with the three officers. Although he was accompanied by two other officers, only Agent Battani spoke to Foster. He asked her if she lived in the apartment and she replied that she did not, that she sometimes stayed at the apartment but did not reside there. Battani asked if there was anyone else in the apartment and Foster replied that her daughter was there. Because Smith told Battani that Foster lived in the apartment, he persisted and asked Foster how long she had lived there, and she replied that she had moved in around February 14th of that year (approximately five months earlier). Foster told Battani that Groves owned the apartment and that he was her boyfriend. In response to questions from Battani, Foster told the agents that she had full access to the apartment and often cleaned it for Groves. When Battani asked for Foster's consent to search the apartment, Foster balked and told Battani that, without first talking to Groves, she did not believe she had the authority to consent to a search. Battani told her that the consent was not between himself and Groves; it was between himself and Foster. He then showed her a consent form and read it to her line by line, asking her at the end of each paragraph if she understood that part of it. Each time, Foster indicated she understood. When he finished reading the form, Battani again asked Foster to consent to a search. This time, Foster agreed to do so and signed the form.

Agent Battani explained that they would be looking for firearms and ammunition and asked Foster to lead them into the apartment. As she walked up the stairs, she told Battani that she had something for him. When they went into the apartment, Foster went into the bedroom and returned with a plastic bag containing marijuana. Foster told the agents that the marijuana was hers and that Groves did not use any type of narcotics. Foster and her daughter sat at the kitchen table with Battani while the other two agents searched the apartment. At times, the searching agents asked Foster questions about the apartment. For example, they asked her which nightstand in the bedroom was hers and whether she had access to both nightstands. As the search proceeded, Foster told Battani that she had never seen firearms in the apartment but that she had seen bullets on Groves' nightstand. From a drawer in Groves' nightstand, the officers recovered a magazine containing five .22 caliber bullets that appeared to Foster to be of the same type she had seen earlier. The officers also recovered a few shotgun shells and a bill in Foster's name for a telephone line at Groves' apartment. As the officers left the apartment, Battani told Foster that there was a body attachment warrant for her. Later, the officers contacted the local school district and determined that Foster's daughter was registered at school using Groves' address as her home address.

Groves was arrested and charged with being a felon in possession of a firearm and being a felon in possession of ammunition. Groves moved to suppress the ammunition discovered in his nightstand, arguing that Foster had neither the actual authority nor the apparent authority to consent to a search of the apartment. The district court held a hearing at which Agent Battani and Shaunta Foster testified. We have already detailed Battani's testimony above and turn now to the points of divergence in Foster's testimony. Foster testified that she told Battani that she

never lived at Groves' apartment but merely visited there frequently, sometimes staying overnight. She maintained that she lived at her mother's apartment. She explained that she gave Groves the phone line as a gift and that she enrolled her daughter in school using Groves' address because he lived in a better school district than she did. According to Foster, she repeatedly told Battani that she could not sign the consent form because she did not live there and her name was not on the lease. She asked repeatedly to call Groves and was refused each time. She testified that when she refused to sign the consent, Battani told her that he would take her downtown and take her daughter to Child Protective Services "but that one way or another he was going to get what he needed to go up in there." Supp. Tr. at 33-34. Foster testified that she signed the consent only because of the threat to remove her child. According to Foster, Battani told her that if she did not consent, she would be criminally charged for any contraband found in the house. Consistent with Battani's testimony, Foster testified that after she had signed the consent form and the officers were already in the house, Battani informed her there was a warrant out for her arrest. At the suppression hearing, Battani denied ever threatening Foster with the removal of her child.

Following the hearing, the district court issued a short order, concluding that Foster had apparent authority to consent to the search of Groves' apartment, that Agent Battani did not engage in inappropriate coercion or threats related to Foster's daughter, and that Foster consented to the search. Groves took his case to a jury and was convicted on both counts. Because no firearm was ever recovered, his conviction on the firearm possession rested largely on the eye-witness testimony of Chavez, the neighbor who told the 911 operator that he did not know who had fired the shots. In court, Chavez identified Groves with no difficulty. The ammunition seized in the apartment search was entered

into evidence over Groves' objection. The district court sentenced Groves to forty-one months' imprisonment after adding four levels to his base offense level because he used the weapon in question to commit the offense of criminal recklessness, a class D felony under Indiana law. Groves timely appeals both his conviction and his sentence.

## II.

On appeal, Groves contends that the district court erred when it denied his motion to suppress the evidence obtained in the warrantless search of his apartment. He also maintains the district court should have granted his motion for a judgment of acquittal on Count I, the felon in possession of a firearm charge, because the government failed to prove that the firearm in question had traveled in interstate commerce. He complains that the district court erred in allowing the government to rebut some of the testimony of Shaunta Foster when she was the government's own witness. He contests his sentence on two grounds, claiming first that the district court did not follow the sentencing procedures set forth in Federal Rule of Criminal Procedure 32(i)(4)(A), and second that the court erred in adding four levels to his base offense level.

## A.

In reviewing the district court's denial of a motion to suppress, we review questions of law *de novo* and factual findings for clear error. *United States v. Denberg*, 212 F.3d 987, 991 (7th Cir. 2000). "To the Fourth Amendment rule ordinarily prohibiting the warrantless entry of a person's house as unreasonable *per se*, one 'jealously and carefully drawn' exception recognizes the validity of searches with the voluntary consent of an individual possessing authority." *Georgia v. Randolph*, 126 S. Ct. 1515, 1520 (2006)

(citations omitted). That individual may be the resident against whom the evidence is sought or a fellow occupant who shares common authority over the property, when the suspect is absent. *Randolph*, 126 S. Ct. at 1520 (*citing Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973) and *United States v. Matlock*, 415 U.S. 164, 170 (1974)). "[T]he exception for consent extends even to entries and searches with the permission of a co-occupant whom the police reasonably, but erroneously, believe to possess shared authority as an occupant." *Randolph*, 126 S. Ct. at 1520 (*citing Illinois v. Rodriguez*, 497 U.S. 177, 186 (1990)). The government argued that Foster had both actual and apparent authority to consent to a search of Groves' apartment and that she consented voluntarily.

The district court found that Foster's testimony and the circumstantial evidence presented at the suppression hearing established that "she was involved at the very least in the mutual use of the property in question and had joint access and control." *United States v. Groves*, No. 3:04cr0076 (N.D. Ind. Nov. 8, 2004) (hereafter "Suppression Order"), at 1. The court stated that, although Foster exhibited hostility when testifying, "she actually admitted a good deal that relates to her joint or common possession of the apartment in question. The totality of sworn testimony plus the documentary proof causes this Court to conclude that she indeed had joint or common authority with reference to the apartment in question." Suppression Order at 2. The court noted that consent was the primary issue and made the following findings:

> This Court listened carefully and observed keenly both of these witnesses on the witness stand. Agent Lucas Battini [sic] testified with caution, great care and restraint. Shaunta Foster testified with great passion and some hostility. After careful consideration and observation, it is the conclusion of this Court that Task Force Agent Lucas Battini [sic] did not engage in

inappropriate coercion or threats with regard to
Shaunta Foster's child in order to secure the consent to
search the apartment. On this subject, the Court must
with some sadness most respectfully decline to credit
that portion of Shaunta Foster's testimony.

Suppression Order at 2. The court then declined to give any
weight to the refusal of a judge to grant the officers a search
warrant, commenting that the circumstances of that refusal
did not bear on the decision the court was required to make.
Without further findings, the court ruled, "When it is all
said and done, she consented to the search and had appar-
ent authority to do so. The motion to suppress is denied."
Suppression Order at 3. Groves argues on appeal that
Foster had neither actual nor apparent authority to consent
to the search and that her consent was not voluntary.

## A.

We begin with the question of actual and apparent
authority. Under *Matlock*, the government bears the burden
of demonstrating that the third party possessed common
authority over or other sufficient relationship to the
premises or effects sought to be inspected. *Matlock*, 415
U.S. at 171; *Denberg*, 212 F.3d at 991.

Common authority is, of course, not to be implied from
the mere property interest a third party has in the
property. The authority which justifies the third-party
consent does not rest upon the law of property, with its
attendant historical and legal refinements, . . . but rests
rather on mutual use of the property by persons gener-
ally having joint access or control for most purposes, so
that it is reasonable to recognize that any of the co-
inhabitants has the right to permit the inspection in his
own right and that the others have assumed the risk
that one of their number might permit the common
area to be searched.

*Matlock*, 415 U.S. at 171 n. 7 (citations omitted). The relevant question for authority to consent under *Matlock*, then, is whether Foster had joint access or control of the apartment for most purposes, or whether she appeared to a reasonable officer to have joint access or control of the premises for most purposes. Facts that militate in favor of a finding of actual or apparent authority include but are not limited to: (1) possession of a key to the premises, *see United States v. Goins*, 437 F.3d 644, 649 (7th Cir.), *cert. denied*, 2006 WL 1221989 (2006); *United States v. Rodriguez*, 888 F.2d 519, 522-23 (7th Cir. 1989); (2) a person's admission that she lives at the residence in question, *Goins*, 437 F.3d at 649; *Denberg*, 212 F.3d at 991; (3) possession of a driver's license listing the residence as the driver's legal address, *Denberg*, 212 F.3d at 991; (4) receiving mail and bills at that residence, *Denberg*, 212 F.3d at 991; (5) keeping clothing at the residence, *Goins*, 437 F.3d at 647; *Denberg*, 212 F.3d at 991; (6) having one's children reside at that address, *Denberg*, 212 F.3d at 991; (7) keeping personal belongings such as a diary or a pet at that residence, *Goins*, 437 F.3d at 649; *Denberg*, 212 F.3d at 991; (8) performing household chores at the home, *Goins*, 437 F.3d 644; (9) being on the lease for the premises and/or paying rent, *Goins*, 437 F.3d at 646; and (10) being allowed into the home when the owner is not present, *Goins*, 437 F.3d at 649.[3] For the apparent authority analysis, the court must consider what the officers knew at the time they sought Foster's consent and whether those facts were sufficient to demonstrate that the officers reasonably, but erroneously, believed that Foster possessed shared author-

---

[3] This is certainly not an exhaustive list and we do not mean to suggest that district courts should use this as a checklist of factors in determining actual or apparent authority. Rather, it is offered to show the types of facts that should and could be considered in evaluating the issue of authority to consent to a search.

ity as an occupant. *Randolph*, 126 S. Ct. at 1250. Facts that came to light after the search began cannot reasonably have influenced the officers' beliefs regarding whether Foster possessed apparent authority.

We cannot discern from the district court's Suppression Order any findings of fact that support the court's conclusion that Foster possessed apparent authority. The court states that Foster's testimony and the documentary evidence establish that she had mutual use and joint access and control of Groves' apartment. The court also states that Foster "admitted a good deal that relates to her joint or common possession of the apartment." But these are legal conclusions rather than factual findings. We do not know on what facts the court relied in reaching this conclusion, nor do we know what part of the testimony the court credited and what part the court disbelieved. There were significant differences between the stories told by Agent Battani and Shaunta Foster at the suppression hearing. The only testimony from Foster that the court declined to credit was her claim that Agent Battani threatened to remove her child if she refused to consent to the search. But this fact related to the voluntariness of her consent and not to her actual or apparent authority to consent. Moreover, these legal conclusions are consistent with a finding of *actual* authority but the court ultimately found that Foster had *apparent* authority to consent to the search. Without knowing which testimony and which documents were credited, without knowing on what facts the court relied in reaching its conclusion, and without knowing whether the court concluded that Foster's authority was actual or apparent, we cannot review the court's conclusion that Foster had authority to consent to the search. We will therefore remand for the district court to make fact-findings in support of its conclusion and to clarify whether Foster had actual or apparent authority to consent, or indeed whether she had *any* authority to consent to a search of the apartment and the nightstand.

After we heard oral argument in this appeal, the Supreme Court held in *Randolph* that "a warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent given to the police by another resident." 126 S. Ct. at 1526. Although Groves was not physically present at the time the officers sought consent from Foster, the reasoning of *Randolph* adds to our understanding of the consent analysis and will be relevant on remand. In *Randolph*, the Supreme Court noted that the common authority that counts for Fourth Amendment purposes may be broader than the rights accorded by property law. "The constant element in assessing Fourth Amendment reasonableness in the consent cases, then, is the great significance given to widely shared social expectations, which are naturally enough influenced by the law of property, but not controlled by its rules." *Randolph*, 126 S. Ct. at 1521. The *Randolph* Court explained that shared tenancy is understood to include an assumption of risk that a guest who is unwelcome to one tenant might be admitted by another tenant when the first tenant is absent. *Randolph*, 126 S. Ct. at 1522.

The tenants might have made an exceptional agreement that no one would admit a guest without the consent of all, but the police were entitled to rely on the more usual expectation that no such agreement existed. *Randolph*, 126 S. Ct. at 1522. However, a visitor standing at the door of shared premises at the invitation of one occupant would have no confidence that one person's invitation was sufficient to enter when the other occupant says, "Stay out." *Randolph*, 126 S. Ct. at 1522-23. "Without some very good reason, no sensible person would go inside under those conditions." 126 S. Ct. at 1523. The Court reasoned that because the "co-tenant wishing to open the door to a third party has no recognized authority in law or social practice to prevail over a present and objecting co-tenant, his

disputed invitation, without more, gives a police officer no better claim to reasonableness in entering than the officer would have in the absence of any consent at all." *Randolph*, 126 S. Ct. at 1523. The Court thus concluded that a warrantless search of a shared residence "over the express refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent given to the police by another resident." *Randolph*, 126 S. Ct. at 1526.

The Court considered the continued significance of *Matlock* in light of its holding in *Randolph* and drew what it called "a fine line[.]" 126 S. Ct. at 1527.

> [I]f a potential defendant with self-interest in objecting is in fact at the door and objects, the co-tenant's permission does not suffice for a reasonable search, whereas the potential objector, nearby but not invited to take part in the threshold colloquy, loses out.

> This is the line we draw, and we think the formalism is justified. So long as there is no evidence that the police have removed the potentially objecting tenant from the entrance for the sake of avoiding a possible objection, there is practical value in the simple clarity of complementary rules, one recognizing the co-tenant's permission when there is no fellow occupant on hand, the other according dispositive weight to the fellow occupant's contrary indication when he expresses it.

*Randolph*, 126 S. Ct. at 1527. We quote this language because there was some evidence that the officers here may have effectively "removed the potentially objecting tenant from the entrance for the sake of avoiding a possible objection." As we noted, Groves was not present when the officers returned to the apartment to request consent to search from Foster. By Agent Battani's own admission, he waited until he knew that Groves would not be home before he approached the apartment. According to Foster, she

repeatedly asked to call Groves and was refused an opportunity to do so. In contrast, Battani testified that he never expressly refused Foster's request to call Groves. Neither of the parties focused on whether the officers procured Groves' absence for the purpose of avoiding an objection and this factor may be relevant to the analysis of the reasonableness of the warrantless search on remand.

**B.**

We turn to the issue of voluntariness. Groves argues that Foster's consent was not given voluntarily. He contends that the district court did not resolve illogical and inconsistent statements in Agent Battani's testimony and that the district court failed to make findings of fact relevant to the resolution of the voluntariness question. The government must demonstrate by a preponderance of the evidence that consent to search was in fact voluntarily given, and not the result of duress or coercion, express or implied. *Bustamonte*, 412 U.S. at 248; *United States v. Basinski*, 226 F.3d 829, 833 (7th Cir. 2000). Whether consent was voluntary is a question of fact to be determined from the totality of all of the surrounding circumstances. *Bustamonte*, 412 U.S. at 227. We review fact-findings made in connection with a decision on suppression for clear error; mixed questions of law and fact as well as pure questions of law are reviewed *de novo*. *United States v. Santiago*, 428 F.3d 699, 704 (7th Cir. 2005); *United States v. Banks*, 405 F.3d 559, 570 (7th Cir. 2005); *United States v. Cellitti*, 387 F.3d 618, 621 (7th Cir. 2004); *Basinski*, 226 F.3d at 833-34. In *Bustamonte*, the Supreme Court articulated several factors that militate against a finding of voluntariness in the confession setting including, but not limited to, youth, lack of education, low intelligence, lack of any advice regarding constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punish-

ment such as the deprivation of food or sleep. 412 U.S. at 226. The Court stated that a determination of voluntariness to consent to a search must similarly take into account evidence of minimal schooling, low intelligence, and the lack of any effective warnings to a person about her rights. *Bustamonte*, 412 U.S. at 248. No single factor is dispositive. *Cellitti*, 387 F.3d at 622. "Rather, it is only by analyzing all the circumstances of an individual consent that it can be ascertained whether in fact it was voluntary or coerced." *Bustamonte*, 412 U.S. at 233; *Cellitti*, 387 F.3d at 622. Only through a "careful sifting of the unique facts and circumstances of each case" may the court determine the question of voluntariness. *Bustamonte*, 412 U.S. at 233.

Therein lies our problem, for the district court made only one finding relevant to the issue of voluntariness and that finding is somewhat ambiguous. The district court noted only that it credited Battani's testimony over that of Foster on the issue of whether Battani engaged in "inappropriate coercion or threats with regard to Shaunta Foster's child in order to secure the consent to search the apartment." Suppression Order at 2. The use of the word "inappropriate" in qualifying "coercion and threats" suggests that the district court may have found some level of threats or coercion appropriate. Any level of threats or coercion related to Foster's child would weigh against a finding of voluntariness. Moreover, we know nothing about Shaunta Foster's level of education, her intelligence, or her age. The transcript gives us pause on the issues of education and intelligence; Foster referred to the ATF agent as "FTD," for example, and some of her speech is consistent with a lack of education.[4] In weighing the totality of the circumstances

---

[4] "ATF" refers to the Bureau of Alcohol, Tobacco, Firearms and Explosives. We presume that "FTD" refers to "Florists' Telegraph Delivery," a well-known flower delivery service. It is certainly

(continued...)

surrounding the consent to search, the district court should have considered those factors together with the number of officers present, what show of force they made, whether they were armed and whether their weapons were visible. The court did not address Foster's claim that Battani threatened to charge Foster with any contraband found in the apartment or her claim that Battani would hold her downtown while he obtained the paperwork he needed to enter the apartment, implying that he could get a warrant when he had tried and already failed to do so. *See United States v. White*, 979 F.2d 539, 542 (7th Cir. 1992) (baseless threats to obtain a search warrant may render consent involuntary). It is impossible for us to review the district court's reasoning without express findings and some indication of how the court weighed *all* of the circumstances surrounding the consent. As Groves points out, both Agent Battani and Foster testified that Foster initially refused to sign the consent. After refusing, Foster then consented after Battani read the consent form to her. Foster claims that there were threats in the intervening time period, specifically threats to remove her child to Child Protective Services and threats to charge Foster with any contraband discovered in the apartment after the "paperwork" was obtained to enter the apartment. Battani testified that there were no threats. We are left wondering why Foster relented so quickly without any change in the circumstances. On remand, the district court should make specific fact-findings regarding the voluntariness of Foster's

_____

(...continued)

possible that Foster simply misspoke, and we do not mean to disparage her in any way. But the issue of intelligence and education was one for the government to prove, and in viewing the record, in the absence of any findings by the district court on this issue, this malapropism along with numerous grammatical errors in Foster's testimony prompt us to seek express findings from the district court.

consent. *See Rodriguez*, 888 F.2d at 524 (remanding so that the district court may make further findings on the scope of consent to search). The court should consider the factors set forth above and analyze the totality of the circumstances surrounding Foster's consent. The court's findings and analysis may well warrant upholding the court's refusal to suppress the evidence, but on this record, we are unable to review that decision.

## C.

Groves raises two challenges to his conviction for possession of a firearm by a felon. First, he argues that there was insufficient evidence of an independent basis, source or origin for the in-court identification of Groves by Chavez. Second, he maintains that there was insufficient evidence that the shotgun in question was transported in, possessed in, or affected interstate commerce. We need not address the in-court identification because Groves prevails on his claim that the government failed to present sufficient evidence on the interstate commerce element of section 922(g)(1).

Section 922(g)(1) provides that it "shall be unlawful for any person . . . who has been convicted in any court of, [sic] a crime punishable by imprisonment for a term exceeding one year . . . to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." 18 U.S.C. § 922(g)(1). The shotgun that Groves was alleged to have fired on July 5, 2004, was never recovered. Chavez, the only witness to testify to the existence of the shotgun, did not identify a make, model, or manufacturer and provided no description of the firearm except to say that he heard a sound like a shotgun being loaded and then saw a shotgun in the hands of the shooter. He told the 911 operator that it "looked like a sawed off shot

gun." 911 Tr. at 1. In seeking to prove the interstate commerce element of the crime, the government produced testimony from John Phinney, a criminal investigator with the ATF. The prosecutor asked Phinney, "[A]re there any major manfacturers of shotguns in the state of Indiana?" Phinney replied, "No, sir, there are not." The prosecutor asked, "So if a shotgun was found in Indiana or was present in Indiana, it would not have been manufactured by any major manufacturer; is that correct?" Phinney replied, "That is correct." Trial Tr., Vol I, at 97. For the ammunition recovered from Groves' apartment on July 21, 2004, Phinney was able to identify the manufacturers and testified that the shells and bullets were manufactured outside of Indiana and therefore had traveled in interstate commerce. Trial Tr., Vol. I, at 98-99. Groves does not challenge the sufficiency of the interstate commerce evidence for the ammunition charge.

In reviewing a defendant's challenge to the sufficiency of the evidence, we view the evidence in the light most favorable to the prosecution. *United States v. Bernitt*, 392 F.3d 873, 878 (7th Cir. 2004), *cert. denied*, 544 U.S. 991 (2005). We affirm if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Bernitt*, 392 F.3d at 878. We will overturn a jury verdict for insufficiency of the evidence only if, after viewing the evidence in the light most favorable to the government, the record is devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt. *Bernitt*, 392 F.3d at 878. We do not reweigh the evidence or make credibility determinations at this stage. *Bernitt*, 392 F.3d at 878. The government maintains that Groves waived this issue by failing to raise it in his motion for judgment of acquittal. In that motion, Groves raised only his challenge to the eyewitness identification. The government argues that when a motion for judgment of acquittal raises specific arguments, any arguments not presented in the motion are

waived. *See United States v. Moore*, 363 F.3d 631, 637 (7th Cir. 2004), *vacated on Booker grounds sub nom. Young & Jackson v. United States*, 125 S. Ct. 1019 (2005). At the close of the government's case, defense counsel moved for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure "on the basis that there has been a total failure of proof linking Mr. Groves to being the person who possessed and discharged the shotgun on the night of July 5th, 2004." Tr. Vol. II, at 5. Counsel did not raise any other issue in the motion and thus waived his challenge to the sufficiency of the evidence on the interstate commerce prong of the firearm charge. *United States v. Allen*, 390 F.3d 944, 947 (7th Cir. 2004); *United States v. Buchmeier*, 255 F.3d 415, 419 (7th Cir. 2001). Therefore, this court will review for plain error. *Allen*, 390 F.3d at 947-48. In this context, "plain" means clear or obvious. *United States v. Stott*, 245 F.3d 890, 900 (7th Cir. 2001), *amended on reh'g in part*, 15 Fed. Appx. 355 (7th Cir. 2001). Even if the error is plain, to meet this standard the error must also affect substantial rights, and it must seriously affect the fairness, integrity or public reputation of judicial proceedings. *Stott*, 245 F.3d at 900.

The government's main proof of the interstate commerce element for the firearm charge was Phinney's testimony that there were no "major manufacturers" of shotguns in Indiana. But the agent gave no definition of "major" and was never asked about minor manufacturers or statistical probabilities that the gun was manufactured outside of Indiana. Without some indication of the meaning of this testimony, without placing it in the context of the gun manufacturing industry, it is simply too vague to support proof of this element of the crime beyond a reasonable doubt. Minor manufacturers could, collectively, manufacture the majority of shotguns produced. Any conclusion drawn from this testimony would be the result of pure speculation as to what the agent meant by "major." Specula-

tion cannot be the basis for proof in the civil context much less the basis for proof beyond a reasonable doubt. *Wainscott v. Henry*, 315 F.3d 844, 851 (7th Cir. 2003).

The government protests that if we hold this proof insufficient, the government will never be able to prove the interstate commerce element in a case where the defendant successfully disposes of a firearm before trial, in contravention of our cases that specifically hold that it is not necessary for the government to produce the firearm at trial. This is simply not true. Granted, the government's case was hampered by the absence of the gun. In some cases, the government will be able to prove that a firearm was manufactured in another state because a witness is able to identify the make, model or manufacturer of the gun. No witness in this case was able to do so. But the government could have questioned the ATF agent further to determine what he meant by "major." As we pointed out at oral argument, follow-up questions could have clarified (if this is indeed the case) that there are no *companies* manufacturing shotguns in Indiana but that *individuals* or small enterprises sometimes manufacture this type of firearm. Further questioning could have quantified the percentage of shotguns that are manufactured by major manufacturers versus by individuals or by other minor manufacturers. If the percentages demonstrate that it is highly unlikely that the shotgun was manufactured in Indiana, such testimony could support proof of this element. At oral argument, the government stated that the ATF expert was unwilling to testify any more specifically about shotgun manufacturers in Indiana. Perhaps the facts did not bear out the government's view of "major" versus "minor." We cannot say on this record why the expert declined to offer any more detail. But there is insufficient evidence to prove that the shotgun moved in interstate commerce at any point in time.

The government next argues that, even if the shotgun was manufactured in Indiana, the prosecution could (and did)

prove this element of the crime by demonstrating that Groves' possession of the shotgun *affected* interstate commerce. The government maintains that, so long as the shotgun possession had some minimal nexus to interstate commerce, we may apply the aggregation doctrine first described in *Wickard v. Filburn*, 317 U.S. 111 (1942). In *Wickard*, an Ohio farmer operated a farm on which, in the year involved, he raised twenty-three acres of wheat. Each year, he sold a portion of the crop, used some of it to feed poultry and livestock on the farm, and used some to make flour for home consumption. The Secretary of Agriculture fined the farmer under the Agricultural Adjustment Act of 1938 because he harvested twelve more acres of wheat than his allotment under the Act permitted. The Supreme Court affirmed the application of the Act to the farmer's purely intrastate activity because the volume of home-consumed wheat, in the aggregate, would have a substantial influence on price and market conditions for all wheat. *See United States v. Lopez*, 514 U.S. 549, 559-60 (1995); *Wickard*, 317 U.S. at 128. One of the primary purposes of the Act was to increase the market price of wheat and limit the supply available. Because home-grown wheat competes with wheat in commerce, Congress could regulate home-grown wheat using its authority under the Commerce Clause. *Lopez*, 514 U.S. at 560; *Wickard*, 317 U.S. at 128.

The government suggests that it provided sufficient proof of the minimal nexus described in *Wickard* in several ways. First, the government argues that it was Groves who fired the shotgun towards Dismas House where Chavez, a construction worker who ran his own business, resided. According to the government, this conduct rendered Dismas House at least temporarily unsafe and ineffective as a residence for convicts, drug addicts, employers and workers. Displacement of workers could result in jobs moving out of state which, in turn, would affect the cost of labor and the local demand for out-of-state labor. Moreover, the govern-

ment would have to pay for other accommodations for the residents of Dismas House or would have to release them, imposing a financial burden or rendering the area unsafe, which could cause citizens to leave the state of Indiana. Second, the government explains, Groves possessed shotgun shells that were manufactured out of state. A jury could reasonably conclude that the missing shotgun was capable of firing these shells, and thus the shotgun would be a "market compliment" [sic] for the shells, affecting the demand for out-of-state shells. Third, and in a similar vein, the government argues that a purely intrastate firearm is a market substitute for a gun obtained through interstate commerce. As such, a failure to regulate the possession of intrastate firearms along with interstate firearms would undercut the regulation of the interstate market. Given where this line of argument is headed, we are half-surprised that the government failed to argue that Groves' use of the firearm as a market substitute for fireworks on that July 5th evening undercut the interstate market in firecrackers.

These might be viable arguments if the Supreme Court had not completely rejected them eleven years ago in *United States v. Lopez*, 514 U.S. 549 (1995), a case the government inexplicably failed to cite in its brief. *Lopez* addressed the constitutionality of another subsection of 18 U.S.C. § 922. In that subsection, Congress made it a federal offense "for any individual knowingly to possess a firearm at a place the individual knows, or has reasonable cause to believe, is a school zone." 18 U.S.C. § 922(q)(1)(A) (hereafter "Subsection 922(q)").[5] A man convicted of bringing a gun and five bullets to the high school where he was a student challenged Subsection 922(q) on the grounds that it exceeded Congress'

---

[5] Following *Lopez*, Congress enacted a new version of Subsection 922(q) that contains a requirement that the firearm "has moved in or that it otherwise affects interstate or foreign commerce."

authority to legislate control over the public schools. The district court found that Congress had the power to legislate in this area under the Commerce Clause because gun possession near a school was an activity in and affecting commerce. *Lopez*, 514 U.S. at 551-52. The appellate court reversed, finding that the statute exceeded Congress's authority to legislate under the Commerce Clause.

The Supreme Court noted that there are three broad categories of activity that Congress may regulate under its commerce power. "First, Congress may regulate the use of the channels of interstate commerce." *Lopez*, 514 U.S. at 558. "Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activity." *Lopez*, 514 U.S. at 558. Third, "Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce," for example, "those activities that substantially affect interstate commerce." *Lopez*, 514 U.S. at 558-59. The Court noted that Subsection 922(q) was a criminal statute that, by its terms, had nothing to do with commerce or economic enterprises. *Lopez*, 514 U.S. at 561. Nor was it "an essential part of a larger regulation of economic activity, in which the regulatory scheme would be undercut unless the intrastate activity was regulated." *Lopez*, 514 U.S. at 561. The Court held that Subsection 922(q) could not be sustained under the cases "upholding regulations of activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce," cases such as *Wickard*. *Lopez*, 514 U.S. at 561. The Court characterized *Wickard* as "perhaps the most far reaching example of Commerce Clause authority over intrastate activity," and noted that it involved economic activity in a way that possession of a gun in a school zone does not. *Lopez*, 514 U.S. at 560.

Subsection 922(q), unlike section 922(g), had no express jurisdictional element that would limit its reach to firearm possessions that additionally had an explicit connection with or effect on interstate commerce. In *Lopez*, the government nevertheless sought to defend the statute on the grounds that possession of a firearm in a local school zone does in fact substantially affect interstate commerce. In particular, the government argued that possession of a firearm near a school could result in violent crime; violent crime would, in turn, affect the national economy in several ways. First, the costs of violent crimes are substantial, and through the mechanism of insurance, the costs are spread throughout the population. Second, violent crime reduces the willingness of individuals to travel to parts of the country that are deemed unsafe. Third, the presence of guns near schools poses a threat to the educational process by threatening the learning environment, ultimately resulting in a less educated and less productive citizenry, which in turn would have an adverse effect on the nation's economic well-being. *Lopez*, 514 U.S. at 563-64.

The Court reasoned that if it accepted the government's argument about the costs of violent crime and the effects on the national economy, there would be no limit to the activities that Congress could regulate, even in areas where States traditionally have been sovereign such as education and law enforcement. *Lopez*, 514 U.S. at 564. Because the possession of a gun in a school zone is not economic activity that, if repeated, would substantially affect interstate commerce, the Court found that to accept this line of argument would obliterate the distinction between what is truly national and what is truly local. *Lopez*, 514 U.S. at 567-68.

We are faced here with a statute that, unlike Subsection 922(q), includes a requirement that the gun possession be "in or affecting commerce." As we found above, the government failed to produce sufficient evidence that the gun had

traveled in interstate commerce, and the government is thus left to argue the same sorts of tenuous connections to commerce that the Court expressly rejected in *Lopez*. For example, the government contends that Groves' possession of the firearm led to the violent act of firing the gun toward a halfway house where convicts and drug addicts lived. In turn, this violence could displace workers, encourage people to move from the unsafe area, and increase the government's cost of housing persons who would otherwise be able to live in Dismas House. In *Lopez*, the Supreme Court rejected the costs of violent crime as the basis for upholding a statute criminalizing gun possession; the Court rejected this rationale because it would federalize areas of criminal law that have historically been the province of the States. A rationale that could not sustain Subsection 922(q) cannot be the basis for upholding a conviction under section 922(g).[6] Failing to require the government to prove an essential element of the crime affects substantial rights and seriously affects the public reputation of judicial proceedings. Because allowing a conviction to stand without proof of an essential element of the crime meets the standard for plain error, we reverse the firearm possession conviction. As we noted above, we need not address Groves' alternate argument regarding the sufficiency of the in-court eyewit-

---

[6] We likewise reject the government's argument that the case should be controlled by *Gonzales v. Raich*, 125 S. Ct. 2195 (2005). There the court rejected a Commerce Clause challenge to the Controlled Substances Act, which the federal government sought to apply to an entirely intrastate possession and manufacture of medical marijuana in California. California allowed that manufacture and possession under the State's Compassionate Use Act. The Court relied heavily on *Wickard*, treating marijuana like an agricultural commodity similar to wheat. In *Lopez*, the Court distinguished *Wickard* because the growth of crops involved commerce in a way that the possession of guns did not.

ness identification because we reverse Count I on Commerce Clause grounds.

**D.**

Groves contends that the district court erred when it allowed the government to present rebuttal evidence in response to the testimony of Shaunta Foster. According to Groves, the only witness called in the defense case was Michael Bennett, an investigator for the Federal Defender's office, who testified about measurements of the distance between the porch of Dismas House and the porch of Groves' apartment. Bennett also presented pictures he had taken of the scene. The government's rebuttal witnesses were the six officers who were on the scene on July 5th. Each countered statements by Shaunta Foster, who testified that the officers surrounded Groves that night in a threatening fashion, clutching batons, and that she had seen the officer who collected shotgun shells that night on the other side of the fence in a neighbor's yard, rather than near the porch of Groves' apartment. The government also recalled Agent Battani to counter other statements Foster made at trial.

We review the district court's decision to allow rebuttal testimony for abuse of discretion. *United States v. Grintjes*, 237 F.3d 876, 879 (7th Cir. 2001); *Mercado v. Ahmed*, 974 F.2d 863, 872 (7th Cir. 1992). The purpose of rebuttal testimony is to contradict, impeach, or defuse the impact of the evidence offered by an adverse party. *Grintjes*, 237 F.3d at 879. The government called Shaunta Foster in its case-in-chief. However, during her cross-examination, Groves' counsel asked her questions that he conceded were beyond the scope of her direct examination. When the government objected, defense counsel offered to bring Foster back to the stand during the defense case. The court then allowed defense counsel to question Foster out of order, that is,

during the government's case-in-chief. Foster testified that the officer who retrieved shotgun shells from the yard came around from the other side of the fence. She also testified that the officers surrounded Groves in a circle, spoke to him in a threatening tone of voice, and that one of the officers "had his baton hitting on his legs." Tr. Vol. I, at 84-89. During the government's initial questioning of Foster, she also testified that Agent Battani threatened to take away her child when obtaining her consent to search.

The court was within its discretion to allow the rebuttal testimony of the six officers present on July 5th in order to counter Foster's testimony under defense questioning. Because the court allowed defense counsel to question Foster out of order rather than call her back to the stand later, this part of her testimony was part of the defendant's case-in-chief. As such, the government was an adverse party to that testimony and could rightly challenge it. Allowing Agent Battani's rebuttal testimony is a closer question. When Foster testified that Battani threatened her, she did so in response to the government's questioning in its case-in-chief. She was not, at that time, an adverse witness to the government, and a party is not generally entitled to rebut its own witness. As the court admonished the government, "You put her on. You knew what she was going to say. You led her right into it. Now, you're a very good lawyer and you've got to live with the consequences of what you do." Tr. Vol. I, at 82. To the extent it was an error for the district court nonetheless to allow rebuttal by Battani, we think the error was harmless. Foster's statement that Battani threatened her was largely irrelevant to the issues the jury had to decide. It is unlikely that Battani's brief rebuttal affected the jury's assessment of the relative credibility of Foster and Battani on any issue in the trial.

**E.**

Finally, Groves challenges the court's Guidelines calculation and the manner in which the court held the sentencing hearing. Because we have reversed the conviction on Count I, the district court must re-sentence Groves. We will address his arguments to the extent that they are relevant to re-sentencing. First, he contends that the district court failed to follow the sentencing procedure established by Federal Rule of Criminal Procedure 32(i)(4), "Opportunity to Speak." Under that provision, before imposing sentence, the court must:

> (i) provide the defendant's attorney an opportunity to speak on the defendant's behalf;

> (ii) address the defendant personally in order to permit the defendant to speak or present any information to mitigate the sentence; and

> (iii) provide an attorney for the government an opportunity to speak equivalent to that of the defendant's attorney.

According to Groves, the court pronounced sentence prior to allowing Groves, his attorney, or the government attorney to speak. The government posits that the court merely announced preliminary findings, then heard all the parties, and subsequently imposed the sentence, all in compliance with Rule 32.

We review the question of whether the district court complied with mandatory sentencing procedures under a non-deferential standard of review. *See United States v. Rodriguez-Alvarez*, 425 F.3d 1041, 1046 (7th Cir. 2005), *petition for cert. filed*, (U.S. Jan. 5, 2006) (No. 05-8615) (reviewing the question of whether the district court complied with mandatory post-*Booker* sentencing procedure using non-deferential review). Our review of the sentencing transcript reveals that both Groves and the government

find support in the record for their respective characteriza-
tions of the sentencing hearing. The district court began the
colloquy by announcing that he would "go through in some
detail the Sentencing Memorandum which will be entered
in this case." Sent. Tr. at 2. Before any of the parties were
invited to address the court, the judge read substantial
portions of the Sentencing Memorandum he had prepared,
and concluded, "[T]his court will and is inclined to sentence
this defendant to 41 months, to be followed by two years of
supervised release." Sent. Tr. at 5. Defense counsel then
spoke for the first time. On each point that defense counsel
raised, the court responded using past tense. For example,
in response to an argument about the description of prior
cases in the PSR, the judge said, "It didn't persuade me."
Sent. Tr. at 7. And in response to defense counsel's argu-
ment on the government's motion for upward departure, the
court remarked, "I didn't grant it." Sent. Tr. at 8. Groves
declined to make a statement and the court then told the
government, "You're on." The government began with by
arguing for the upward departure by citing Groves' prior
criminal record. The court replied, "Well, I didn't consider
all of that, as you know. You will see it when it's in writing.
I sorted it down very carefully." Sent. Tr. at 9. After a few
more remarks from the government, the court stated, "I will
sign off on the Sentencing Memorandum. . . . The sentence
is 41 months. He gets credit for time served. The sentence
is to be followed by two years of supervised release." Sent.
Tr. at 10.

The government characterizes the court's initial remarks
as "tentative sentencing decisions" and argues that all
parties were invited to speak before sentence was "formally
imposed." The court's language, though, was not particu-
larly tentative. The tone of the court during the parties'
remarks suggests that the court had already ruled on every
issue raised and was unwilling to reconsider any of those
rulings based on the parties' arguments and statements.

Although the sentence may not have been "formally imposed" before the parties spoke, this colloquy was not entirely consistent with the spirit of Rule 32(i)(4)(A). The judge essentially signaled to the parties that his ruling was final before the hearing began. But the court did comply with the letter of Rule 32; it did not formally enter the sentencing order until after the parties had an opportunity to speak. On remand, we have no doubt that the court will fully comply with Rule 32(i)(4)(A) by considering the parties' arguments and statements before the sentence is imposed.

Groves also challenges the court's calculations under the Guidelines, complaining that the court exceeded its authority in adding four levels to Groves' offense level based on a finding that Groves used the shotgun to commit the offense of criminal recklessness under Indiana law. *See* U.S.S.G. § 2K2.1(b)(5). Section 2K2.1(b)(5) provides for a four-level increase to the base offense level if "the defendant used or possessed any firearm or ammunition in connection with another felony offense." Application Note 4 of the Commentary for that provision defines "felony offense" as "any offense (federal, state, or local) punishable by imprisonment for a term exceeding one year, whether or not a criminal charge was brought, or conviction obtained." In the PSR, in reporting the government's version of the offense, the probation officer noted that Groves possessed and used the shotgun (and presumably ammunition, given the shells found on the ground near the porch that night) to fire shots in the direction of Dismas House, endangering the lives of the three people present on the porch. PSR, ¶ 6(j). Groves did not object to this paragraph, and did not object at the sentencing hearing to the additional four levels under section 2K2.1(b)(5). The argument is therefore waived and we review the court's calculation for plain error. *Allen*, 390 F.3d at 947-48; *Stott*, 245 F.3d at 900.

The Indiana statute provides that a person who recklessly, knowingly, or intentionally performs an act that

creates a substantial risk of bodily injury to another person commits criminal recklessness. Ind. Code § 35-42-2-2. If the offense is committed while armed with a deadly weapon, it constitutes a Class D felony under Indiana law. *Id.* The court found that Groves committed this offense by firing the shotgun toward Dismis House.[7] The testimony of Chavez and the testimony of the officers who retrieved spent shotgun shells from Grove's yard that night together were sufficient to demonstrate by a preponderance of the evidence that Groves committed this offense. We see no error in the district court's calculations. Groves complains that the jury did not find beyond a reasonable doubt that he committed this Indiana offense and he did not admit the facts necessary to prove that charge beyond a reasonable doubt. He contended that the court's findings were made under, at most, a preponderance of the evidence standard. He characterizes the use of the preponderance standard as a violation of *United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738 (2005). But Groves' sentence did not exceed the statutory maximum, and the district court did not treat the Guidelines as mandatory. The use of the preponderance standard was appropriate, and there is no error to correct. *See United States v. Sliman*, 449 F.3d 797, 800-01 (7th Cir. 2006); *United States v. Robinson*, 435 F.3d 699, 701 (7th Cir. 2006).

## III.

On remand, the district court should enter fact-findings in support of its ruling on the motion to suppress, and

---

[7] The possibly intrastate nature of the shotgun does not matter in this context. The origin of the gun is irrelevant under Indiana state law. Moreover, the use of the gun at this stage of the sentencing proceedings would be evaluated under the standards for relevant conduct, where the preponderance standard applies.

should consider the totality of the circumstances in determining whether Foster's consent was voluntarily given. If Foster's consent was not voluntary, the suppression ruling cannot stand, and the conviction on the ammunition count would be in jeopardy. We do not mean to suggest a particular outcome for the motion to suppress; we note only that, as it stands, there is insufficient fact-finding and insufficient analysis for appellate review. It is possible that after the court makes the appropriate findings in support of its decision to deny that motion, defense counsel may withdraw its objection to the ruling; it is also possible there may still be some non-frivolous basis for further review. We reverse the conviction on Count I, the firearm possession charge, for the reasons stated above. In light of that reversal, the district court should resentence Groves. At any new sentencing hearing, the district court should allow an appropriate Rule 32 colloquy before imposing sentence. In all other respects, we affirm.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*