NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0127n.06

No. 18-6103

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | **FILED** |
| Plaintiff-Appellee, | ) | Mar 03, 2020 |
| | ) | DEBORAH S. HUNT, Clerk |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| ANTWAN LAMONT BATES | ) | EASTERN DISTRICT OF KENTUCKY |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

BEFORE:    DAUGHTREY, CLAY, and GRIFFIN, Circuit Judges.

MARTHA CRAIG DAUGHTREY, Circuit Judge.   Defendant Antwan Bates began a ten-year term of supervised release on September 21, 2016, after serving 96 months in prison following his guilty plea to possession of crack cocaine with intent to distribute.  Two years later, Bates's probation officer obtained transcripts of calls between Bates and his son, who was being detained by the county, and concluded that Bates had handled his son's guns, in violation of federal law prohibiting felons from receiving, transporting, or possessing a firearm in or affecting interstate or foreign commerce.  Relying principally on the transcript of the calls, the district court revoked Bates's supervised release and ordered him to serve 60 months in prison.

On appeal, Bates challenges the revocation of supervised release on two grounds: (1) that there was insufficient evidence of a violation because the government did not recover a firearm or identify a witness connecting Bates to a firearm  and (2) that the government offered no proof that the firearm Bates was charged with possessing had traveled in or affected interstate commerce.

Because of error in connection with the second issue, we find it necessary to vacate the district court's judgment and order reinstatement of supervised release.

## FACTUAL AND PROCEDURAL BACKGROUND

In 2010, Bates pleaded guilty to the possession of crack cocaine with the intent to distribute in violation of 21 § U.S.C. 841(a)(1). The district court sentenced him to 96 months in prison, to be followed by ten years of supervised release. After his discharge from prison in September 2016, Bates maintained employment, paid child support, never tested positive for drugs, and otherwise had no reported violations. But, in September 2018, Bates's probation officer, John Rapier, discovered that Javantez Masters, a detainee in the Fayette County Detention Center, was making calls to Bates's personal cell phone. Masters, whom Rapier determined to be Bates's son, had been arrested a month earlier and charged with trafficking marijuana and possession of drug paraphernalia. Rapier conducted a search of the calls made by Masters and gained access to 23 of them. He proceeded to listen to all 23 calls and "transcribed by hand" the "parts of the calls [he] deemed evidentiary."

The first call entered into evidence was between Masters and a woman believed to be Masters's girlfriend. The conversation concerned a burglary of Masters's residence that occurred after he was arrested and was caught on camera because of his home security system. On the call, Masters said that he had guns in his home, all belonging to him, specifically one in a cabinet in his bedroom. Masters at one point said, "I'm glad my daddy did come in when he did because then they really would have had some shit." In a later call between Masters and the same woman, she reported what she had seen on the security camera, saying that the burglars opened doors to the bedroom but did not take anything out of it. Masters responded, "Yeah, there wasn't cause my daddy came and got it," without specifying what "it" was.

Nevertheless, it became apparent from calls made the same day by Masters to Bates that the two men were referring to Masters's guns, which Bates had initially locked in a safe when he went to his son's house after Masters was jailed but before the burglary. He went back to the residence after the burglary and cleared out the safe, taking the contents with him. The conversation between Masters and Bates, unlike the one between Masters and his girlfriend, did not explicitly refer to guns but, instead, to "the stuff," "that shit," "the black one," "the brown one," and the one with "the extended clip."[1] Based on his interpretation of the phone conversations, Bates's probation officer secured a warrant for a supervised-release violation, and Bates was arrested. But there is no indication in the record that a search was conducted at either

---

[1] The record establishes the following conversation, for example:

J. Masters- "So you say they took my clips, man that shit ain't nothing."
A. Bates- "Yeah, the clips that was on the bed and stuff."
J. Masters- "You said everything else was in my safe or something?"
A. Bates- "Uh, I went and got what I left in that safe. What I told you I wasn't going to get, I went on and grabbed that, I got that."
J. Masters- "Oh so you got everything?"
A. Bates- "I got what I left, you know what I said I didn't get, I got it."
J. Masters- "That's what I'm saying, that's what I thought, they may have got that shit."
A. Bates- "Nah, I locked it when I left, so when I went back, you know they couldn't get in there."
J. Masters- "I got some in my bathroom too."
A. Bates- "I locked them up when I left."
J. Masters- "Ah, so you locked them all up (unintelligible)."
A. Bates- "Yeah."
J. Masters- "There was some, there was some in the kitchen drawers, did you see those?"
A. Bates- "No, I didn't, I didn't see nothing." … "If there was, they got it." "There was some of what, what I had locked away or it was something else?"
J. Masters- "How many do you got locked away?"
A. Bates- "I had 2."
J. Masters- "And was it the black one and the…."
A. Bates- "The brown one."
J. Masters- "Yeah, that, they took all the rest of the shit then, I had 3 more."
A. Bates- "You had 3 more like that?"
J. Masters- "They in the Kitchen."
A. Bates- "Like that, like that, or smaller?"
J. Masters- "Smaller, they was in the kitchen drawers."
A. Bates- "They got you on them."

Bates's or Masters's home, and the guns were never produced in evidence. As a result, the record is devoid of any proof — or even an allegation by the government — that the weapons had traveled in interstate commerce. In the absence of a defense objection to this omission, the district court revoked Bates's supervised release and ordered his return to prison for an additional 60 months.

## DISCUSSION

On appeal, Bates argues that there is no evidence that what he took from his son's house were, in fact, firearms and, by extension, that the revocation of his supervised release based on possession of a firearm should be reversed. Our review of the record suggests, however, that the government established Bates's possession by sufficient circumstantial evidence.

Bates also challenges the district court's revocation order on the ground that the court did not find that the firearms in question ever traveled across state lines or otherwise affected interstate commerce, which is required in order to establish guilt under 18 U.S.C. § 922(g), the federal statute that prohibits possession of a firearm by a convicted felon. To prove an offense under § 922(g), the government must prove that the defendant not only possessed a firearm but also that "the firearm had traveled in or affected interstate commerce." *United States v. Kincaide*, 145 F.3d 771, 782 (6th Cir. 1998) (quoting *United States v. Moreno*, 933 F.2d 362, 372 n.1 (6th Cir. 1991)).

Although we review a revocation of supervised release for an abuse of discretion, *United States v. Stephenson*, 928 F.2d 728, 732 (6th Cir. 1998), when an argument is not raised before the district court, plain-error review applies. "[B]efore an appellate court can correct an error not raised at trial, there must be (1) 'error,' (2) that is 'plain,' and (3) that 'affect[s] substantial rights.'" *Johnson v. United States*, 520 U.S. 461, 466–67 (1997) (alteration in original) (quoting *United States v. Olano*, 507 U.S. 725, 732 (1993)). If those conditions are met, we "may then exercise [our] discretion to notice a forfeited error, but only if (4) the error 'seriously affect[ed] the fairness,

integrity, or public reputation of judicial proceedings.'" *Id.* (quoting *Olano*, 507 U.S. at 732). Despite a general objection to the court's determination that Bates could be found guilty of violating § 922(g), there was no specific objection to the failure to prove the interstate-commerce element. As a result, we review the district court's decision for plain error.

A review of the entire district court record—the probation officer's report, hearing transcripts, and witness and exhibit lists—reveals absolutely no mention of the interstate-commerce element of § 922(g). Citing *Jackson v. Virginia*, 443 U.S. 307 (1979), the government would have us conclude that because the district court found that Bates violated federal law, it naturally follows that the court must have found that each element of the offense was satisfied. But the government's deduction from that case, that "the district court could not have found a violation of federal law had an element been lacking," is misplaced. The *Jackson* Court held that "a federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Jackson*, 443 U.S. at 326.

In *Jackson*, however, the issue was whether there was sufficient evidence to prove the specific intent necessary for first-degree murder. *Id.* at 311. The record reflected an abundance of evidence regarding the defendant's state of mind: his intoxication level, warning shots he fired, and the number of times the victim was shot. *Id.* at 312. The record also indicated that the sitting judge "was aware that the State bore the burden of establishing the element of premeditation" and that the defense presented evidence intended to disprove it. *Id.* at 313. Here, on the other hand, there is no indication in the record that the interstate-commerce element was even acknowledged.

Moreover, although we assume that the district court was aware of the necessary element, there is no evidence in the record to support that assumption.

The government's more cogent argument is that because the guns Bates allegedly possessed were assumed to be pistols or handguns, they were "more likely than not . . . manufactured outside of Kentucky." The government tells us that the "vast majority of firearms manufactured in the Commonwealth are long guns" and that although there is "one, small handgun manufacturer" in Kentucky, the "products are relatively expensive and generally purchased by collectors." Without citing to any sources for this information, the government supports this assertion by declaring only that it is "well-known to the bench . . . in the Eastern District of Kentucky." Particularly when not discussed at a hearing, this kind of generalized knowledge is not of the type of which judicial notice can be taken. Although we have not addressed this exact concept directly, other circuits have. The Second Circuit, for instance, vacated a district court conviction under § 922(g) in which "the only evidence that the gun traveled in interstate commerce is the arbitrary inference that any gun found in New York must have been made outside New York." *United States v. Jones*, 16 F.3d 487, 492 (2d Cir. 1994). Additionally, the Seventh Circuit has gone further by condemning the use of vague testimony to prove this element:

> The government's main proof of the interstate commerce element for the firearm charge was Phinney's testimony that there were no "major manufacturers" of shotguns in Indiana. But the agent gave no definition of "major" and was never asked about minor manufacturers or statistical probabilities that the gun was manufactured outside of Indiana. Without some indication of the meaning of this testimony, without placing it in the context of the gun manufacturing industry, it is simply too vague to support proof of this element of the crime beyond a reasonable doubt.

*United States v. Groves*, 470 F.3d 311, 324 (7th Cir. 2006).

It is well-accepted in this circuit that in felonious-possession cases, "proof that the firearm was manufactured outside the state in which the possession occurred is sufficient to support a finding that the possession was in or affected interstate commerce." *See, e.g.*, *United States v. Jones*, 533 F.2d 1387, 1393 (6th Cir. 1976). Although the government may prove that a gun was made in another state through a witness, doing so requires not only expert testimony but also a showing of the type of gun in question. *United States v. Vincent*, 20 F.3d 229, 236 (6th Cir. 1994) (finding that the gun the defendant had brandished at police, a Colt Mark 45, was sufficiently shown to be manufactured outside of the state through the testimony of a firearms examiner from the Bureau of Alcohol, Tobacco & Firearms). Significantly, we acknowledged in *United States v. Sevier* that "[i]t is virtually impossible to show facts establishing the interstate movement of a particular weapon until that weapon is inspected." 539 F.2d 599, 603 (6th Cir. 1976) (holding, however, that in the context of a search warrant, it is unnecessary to determine the gun model or show the nexus between interstate commerce and possession because the purpose is to obtain that evidence for trial).

The government cites no case, and we know of none, in which the determination of interstate-commerce nexus is sufficiently made without knowing the manufacturer, make, or model of the gun, or demonstrating that the gun had crossed state lines while in the defendant's possession. *See, e.g.*, *United States v. Robinson*, 205 F. App'x 415, 417 (6th Cir. 2006) (finding that the inscriptions on the gun in question ("Bryco Arms" and "Costa Mesa, California, U.S.A.") were sufficient to prove the gun was manufactured outside Ohio); *United States v. Smith*, 320 F.3d 647, 655–56 (6th Cir. 2003) (relying on testimony from two witnesses that the defendant prepared and armed himself for a home invasion while in Tennessee, then traveled to Georgia where he held

hostages at gunpoint); *Jones*, 533 F.2d at 1392 (holding that testimony showing the gun in question was made in West Germany in 1968 was sufficient to satisfy the interstate-commerce element).

Although we have recognized that the district court erred by failing to address the interstate-commerce element of § 922(g), we must also determine whether the error was "plain" and whether it "affect[ed] substantial rights." *Johnson*, 520 U.S. at 467 (quoting *Olano*, 507 U.S. at 732). An error is "plain" if it is "clear" or "obvious." *Olano*, 507 U.S. at 734. It is generally understood that all elements of an offense must be proven prior to sentencing a defendant and that not doing so is clear error. *See, e.g.*, *United States v. Wolfe*, 245 F.3d 257, 261 (3d Cir. 2001) (holding that "the prosecution's failure to prove an essential element of the offense constitutes plain error"). Next, we must also determine whether Bates was prejudiced by the error. "An effect on substantial rights is typically established through a showing of an actual effect on the outcome of the case." *United States v. Lopez-Medina*, 461 F.3d 724, 745 (6th Cir. 2006) (citing *United States v. Jones*, 108 F.3d 668, 672 (6th Cir. 1997) (*en banc*)). Based on the precedent and evidence outlined above, it is likely that the government would have had difficulty showing a nexus between Bates's conduct and interstate commerce. Moreover, it is obvious that if the failure of proof in this case had been brought to the attention of the district court, the result would have been the equivalent of an acquittal.

Finally, because we have determined that the first three conditions of the plain-error standard are met, we address the discretionary question of whether the error "seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings." *Johnson*, 520 U.S. at 462. Although a revocation hearing does not require the same degree of due process required in a criminal trial, it "does result in a loss of liberty" and thus requires a certain level of due process. *Gagnon v. Scarpelli*, 411 U.S. 778, 781–82 (1973). For our justice and rehabilitation systems to

function properly, the public must have confidence in their operations. As one of our sister circuits has noted, "affirming a conviction where the government has failed to prove each essential element of the crime beyond a reasonable doubt . . . seriously impugns the fairness, integrity and public reputation of judicial proceedings." *United States v. Jones*, 471 F.3d 478, 480 (3d Cir. 2006) (quoting *United States v. Gaydos*, 108 F.3d 505, 509 (3d Cir. 1997); *see also Johnson*, 520 U.S. at 467. The same conclusion applies to a decision to revoke supervised release when the government fails to meet its burden of proof, but the defendant would nevertheless serve a term of imprisonment.

## CONCLUSION

For the reasons set out above, we VACATE the sentence and revocation of supervised release, and REMAND the case to the district court with instructions to reinstate Bates's term of supervised release.